## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## EAST ST. LOUIS DIVISION

| | |
|---|---|
| J-M MANUFACTURING COMPANY, INC., | |
|       Plaintiffs, | |
|       v. | Civil Action No. |
| THE GORI LAW FIRM, BETH GORI-GREGORY, SARA SALGER, ERIN BEAVERS, JASON STEINMEYER, CHRISTOPHER LAYLOFF, AND JOHN AND JANE DOES 1-25, | Counts I-II: RICO (18 U.S.C. § 1962(c)) <br> Count III: RICO (18 U.S.C. § 1962(a)) <br> Count IV-V: RICO (18 U.S.C. § 1962(d)) <br> Count VI: Common Law Fraud <br> Count VII: Unjust Enrichment <br> Count VIII: Civil Conspiracy |
|       Defendants. | |

## COMPLAINT

Plaintiff J-M Manufacturing Company, Inc. ("J-M Manufacturing") brings this action against the Gori Law Firm ("the Gori Firm"), Beth Gori-Gregory, Sara Salger, Erin Beavers, Jason Steinmeyer, Christopher Layloff (collectively, "Individual Defendants"), and John and Jane Does 1-25 (together with the Gori Firm and Individual Defendants, the "Defendants"), for a multi-year pattern of racketeering activity in which Defendants schemed and conspired to file and prosecute sham lawsuits, pursued baseless claims, coached witnesses to commit perjury, and otherwise sought to extract money from J-M Manufacturing through a pattern of fraud and deception.

### INTRODUCTION

1.    More than forty years have passed since asbestos was phased out of the marketplace. The number of cases of asbestos-related disease has been on the decline since the early 1990s. Meanwhile, more than 100 companies have been driven to bankruptcy due to asbestos-related liabilities. Given this, most Americans regard asbestos litigation as a thing of the past.

2.      But that is far from true.  Today asbestos litigation remains a multi-billion dollar industry, with thousands of new cases filed each year.  One study by NERA Economic Consulting estimated that the total cost of asbestos litigation to the American economy had reached $343 billion as of 2005.[1]  Unfortunately, courts, commentators, and the United States Department of Justice have highlighted for years a concerning pattern of misconduct by plaintiff's law firms in asbestos litigation.[2]  This case focuses on the unfortunate perpetuation of that trend, which lies at the heart of the current epicenter of asbestos litigation.

3.      For at least the past decade, the Gori Firm has been the top filer of asbestos lawsuits in the country.[3]  It files an average of 630 lawsuits every year.  It is also one of the most financially successful, claiming to have recovered $4 billion since inception.  In 2024, the firm of 45 attorneys

---

[1] Stephanie Plancich, NERA Economic Consulting, Costs of Asbestos Litigation and Benefits of Reform (April 25, 2005), available at: https://www.nera.com/content/dam/nera/publications/archive1/Asbestos_Litigation_Summary_April_2005_Final2.pdf (last accessed Jan. 21, 2026).

[2] *See, e.g.*, *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-116, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015) (stating asbestos litigation misconduct alleged "goes well past the kind of routine litigation activities" in an ordinary case); *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014) (observing a "startling pattern of misrepresentation" in asbestos litigation"); *CSX Transp., Inc. v. Gilikison*, No. 5:05CV202, 2012 WL 1598081, at *10 (N.D. W. Va. May 3, 2012) (concluding alleged conduct amounted to a complex fraud scheme that went beyond ordinary litigation activity); Lester Brickman, Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?, 40 Cardozo L. Rec. 2301 (2019); Honorable Peggy L. Ableman, The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases 37 Am. J. Trial Advoc. 479 (2014); Lester Brickman, Fraud and Abuse in Mesothelioma Litigation, 88 Tul. L. Rev. 1072 (2014); Roger Parloff, The $200 Billion Miscarriage of Justice, Fortune, Mar. 4, 2002; U.S. Dep't of Justice, Justice Department Files Statement of Interest Urging Transparency in the Compensation of Asbestos Claims (Dec. 28, 2020).

[3] *See* KCIC, Asbestos Litigation: 2017 Year in Review, at p. 5, available at: https://www.kcic.com/asset/pdf/KCIC-2017-AsbestosReport.pdf; KCIC, Asbestos Litigation: 2020 Year in Review, at p. 7, available at: https://www.kcic.com/media/2153/kcic_asbestos2020report.pdf; KCIC, Asbestos Litigation: 2022 Year in Review, at p. 9, available at https://www.kcic.com/media/2253/kcic_asbestos2022report.pdf; KCIC, Asbestos Litigation: 2024 Year in review, at p. 8, available at https://www.kcic.com/media/2462/kcic_report_asbestos-annual-report_2024-1.pdf.

filed approximately 788 lawsuits, or roughly 20% of all new cases nationwide. The overwhelming majority of these cases were filed in two Illinois counties along the Mississippi River: Madison County and St. Clair County. Madison County, where the Gori Firm is headquartered, has a population of only 265,000, but is the top venue for asbestos lawsuits in the United States. It is also home to Simmons Hanly Conroy LLP, the second most prolific filer of asbestos lawsuits in recent years.

4.      Since at least 2018, the Gori Firm has filed nearly 5,000 lawsuits, more than 400 of which have named J-M Manufacturing as a defendant. Of those cases, more than 350 were filed in Madison and St. Clair Counties even though most of those plaintiffs were not Illinois residents, nor did their claims have any real nexus to the state. Of the approximately 434 cases the Gori Firm has filed against J-M Manufacturing since 2018, approximately 418 have been dismissed—a 96.3% dismissal rate. This extraordinary dismissal rate, unprecedented in legitimate litigation, demonstrates that the overwhelming majority of filings had no realistic prospect of success and were filed for purposes other than obtaining relief on the merits.

5.      While none of the cases against J-M Manufacturing ever went to trial, the Gori Firm nevertheless caused J-M Manufacturing to spend vast sums of litigation fees and expenses defending against these claims. Recent discoveries, including detailed insider information provided by a former Gori attorney who worked at the firm from approximately 2018 to 2024, have shone a new light on the Gori Firm's conduct that reveals a systematic scheme of fraud operating beneath the surface of ostensibly ordinary asbestos litigation.

**HISTORICAL CONTEXT: JUDICIALLY-RECOGNIZED FRAUD IN ASBESTOS LITIGATION**

6.      J-M Manufacturing is far from the first company to seek judicial relief against asbestos plaintiff's law firms engaged in fraudulent and deceptive tactics. Federal courts have

long recognized that certain asbestos plaintiff law firms have engaged in systematic fraud that extends "well past the kind of routine litigation activities" in ordinary cases. *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-116, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015). The scheme alleged herein follows a similar pattern identified in these prior cases, but is independently supported by direct testimony from a former Gori attorney who witnessed and participated in the scheme from roughly 2018 to 2024.

### A.    The Baron & Budd Memo: The Original Playbook

7.      The first major revelation of asbestos litigation fraud arose from a case filed by G-I Holdings, Inc. against the law firm Baron & Budd. *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233 (S.D.N.Y. 2001). In that case, G-I Holdings obtained a twenty-page "witness preparation" memorandum—the "Baron & Budd Memo"—that set forth specific instructions to clients as to the answers to give during depositions.

8.      The Baron & Budd Memo instructed clients on: (a) the products to which they should claim exposure; (b) the products to which they should *not* claim exposure (specifically, products of bankrupt companies whose trust claims the firm intended to pursue separately); and (c) the absence of warning labels on products. Critically, the memorandum assured clients that defense lawyers would have no way of knowing what products they had actually used—signaling that false testimony could not be effectively challenged.

9.      The Baron & Budd Memo is directly relevant to the Gori Firm's conduct because the whistleblower's account reveals that the Gori Firm created substantially similar materials: product identification booklets that specified which products plaintiffs should "recognize," trust affidavit protocols designed to maximize claims regardless of actual exposure, and training programs instructing depo attorneys on how to coach testimony that would be difficult to disprove.

The Gori Firm's "bounty system" added a financial incentive layer not present in the Baron & Budd scheme, making the fraud even more systematic, corrupt, and pervasive.

### B.     The CSX Litigation: RICO Liability Established

10.     The second major case was filed by CSX Transportation, Inc. against asbestos plaintiff attorneys in West Virginia. *CSX Transp., Inc. v. Gilkison*, No. 5:05CV202, 2012 WL 1598081 (N.D. W. Va. May 3, 2012). There, the district court concluded that the alleged conduct amounted to a complex fraud scheme that went beyond routine litigation activity. *Id.* at *10-11.

11.     The CSX scheme involved bribing union officials to obtain clients, generating claimants through mass screenings and fraudulent medical readings, and filing mass lawsuits to force settlements of bogus claims. When the West Virginia courts issued a case management order requiring claimants to certify that their claims were "well-founded in fact," the plaintiff law firms moved to dismiss all but two of approximately 1,400 claims. The subsequent RICO lawsuit resulted in a multi-million dollar verdict against the plaintiff attorneys.

12.     The CSX case establishes that asbestos litigation fraud can constitute RICO violations when it goes beyond routine litigation activity, including where plaintiff attorneys file mass lawsuits to force settlements of bogus claims. The Gori Firm's 96.3% dismissal rate—418 of 434 cases dismissed since 2018—demonstrates a pattern even more extreme than CSX, where the voluntary dismissals were triggered by a certification requirement. Here, the Gori Firm continued filing objectively baseless cases for years with no certification requirement forcing withdrawal.

### C.     The Garlock Bankruptcy: The "Startling Pattern"

13.     The third major revelation came from the bankruptcy proceedings of Garlock Sealing Technologies, LLC, in which the bankruptcy court found "a startling pattern of

misrepresentation" by asbestos plaintiff law firms. *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014).

14.     In estimating Garlock's asbestos liabilities, the bankruptcy court examined exposure evidence in cases against Garlock and discovered that the same plaintiff law firms had presented conflicting exposure narratives to the tort system (minimizing exposure to bankrupt companies' products) and the trust system (maximizing claims against those same bankrupt companies). The court found that plaintiff law firms routinely withheld evidence of their clients' exposure to products of bankrupt companies during tort litigation, only to submit trust claims asserting those very exposures after the tort cases settled.

15.     The bankruptcy court's findings led to multiple RICO lawsuits by Garlock and John Crane, Inc. against asbestos plaintiff law firms.[4]  In one of those cases, a principal of a plaintiff law firm admitted that it was his regular practice to delay filing trust claims until after the personal injury cases against solvent entities were settled.

16.     The Gori Firm's scheme follows this playbook: the whistleblower confirmed that depo attorneys were trained to delay trust claim submissions until two weeks after the plaintiff's deposition specifically so plaintiffs could deny having filed claims when asked. The 30-40 trust affidavits signed before the first client meeting—covering exposure to products of bankrupt companies—were deliberately withheld from disclosure in tort litigation.

---

[4] *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-cv-137, 2015 WL 5155362 (W.D.N.C. Sep. 2, 2015); *Garlock Sealing Techs., LLC, v. Waters & Kraus, LLP*, No. 3:14-cv-00130, 2015 WL 1022291 (W.D.N.C. Mar. 9, 2015); *Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett*, No. 3:14-cv-00116, 2015 WL 5148732 (W.D.N.C., Sep. 2, 2015); *Garlock Sealing Techs., LLC v. Belluck & Fox, LLP*, No. 3:14-cv-118, 2015 WL 1022279 (W.D.N.C. Mar. 9, 2015); Complaint, *John Crane, Inc. v. Shein Law Ctr., Ltd.*, No. 1:16-cv-5913, 2016 WL 3251230 (N.D. Ill. June 6, 2016); Complaint, *John Crane, Inc. v. Simon Greenstone Panatier Bartlett*, No. 1:16-cv-5918, 2016 WL 3251232 (N.D. Ill. June 6, 2016).

**D.    Why This History Matters**

17.    This historical context is relevant for three reasons.  First, J-M Manufacturing is not alleging a novel or speculative theory. Federal courts have found that asbestos plaintiff law firms engage in systematic fraud involving coached testimony, concealed trust claims, and scripted product identifications. The Gori Firm's conduct fits squarely within this established pattern.

18.    Second, it provides a roadmap for what constitutes conduct "beyond routine litigation activity" for purposes of the Noerr-Pennington sham exception and RICO liability. The courts in *Garlock* and *CSX* identified specific indicia of fraud—scripted testimony, concealed exposures, mass dismissals when challenged—that are present here in even more egregious form.

19.    Third, it corroborates the whistleblower's account. The Baron & Budd Memo showed that asbestos plaintiff firms create written materials to coach testimony; the Gori Firm's product identification booklets serve the same function. The Garlock cases showed that firms systematically delay trust claims to avoid disclosure; the Gori Firm trained depo attorneys to do exactly that. The CSX case showed that mass filings without merit lead to mass dismissals when scrutinized; the Gori Firm's 96.3% dismissal rate speaks for itself.

20.    Unlike the prior cases, however, J-M Manufacturing has something those plaintiffs lacked: a former insider who participated in the scheme and who confidentially described its inner workings in detail.  The whistleblower's account is not inference from suspicious patterns—it is direct evidence of how the bounty system operated, how depo attorneys were trained, and why objectively baseless cases were filed as "bargaining chips."

**PARTIES**

21.    J-M Manufacturing Company, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.  J-M Manufacturing is one of the largest plastic pipe manufacturers in the United States and has more than 800 employees located in manufacturing

facilities across the country. J-M Manufacturing has only existed since 1983, when it acquired certain PVC-related plants and assets that used to belong to Johns-Manville. Johns-Manville was a different company that went bankrupt in 1982 and created a bankruptcy trust to handle claims associated with its asbestos-containing products, primarily insulation. From only 1983 through 1988, J-M Manufacturing supplied a limited amount of asbestos-cement pipe ("ACP") to accommodate water districts that mandated or approved its use, until those clients transitioned to PVC pipes. This timing is critical because, as described herein, the Gori Firm repeatedly filed lawsuits against J-M Manufacturing on behalf of plaintiffs whose work histories ended years before J-M Manufacturing came into existence—making exposure to J-M Manufacturing's products impossible.

22.     The Gori Law Firm, P.C. (the "Gori Firm") is an Illinois professional corporation with its principal place of business in Edwardsville, Illinois. The Gori Firm represents asbestos plaintiffs in personal injury and wrongful death litigation.

23.     Beth Gori-Gregory ("Gori-Gregory") is an individual who resides in Madison County, Illinois and works at the Gori Firm's headquarters in Edwardsville, Illinois. She is the Principal Partner and Owner of The Gori Firm. Gori-Gregory is a "person" as defined in 18 U.S.C. § 1961(3), legally distinct from the Gori Firm. As Principal Partner and Owner, Gori-Gregory has ultimate authority over firm policies, including the implementation of the bounty system described herein, the approval of the bounty list of target defendants, and the strategic decisions that enabled the fraudulent scheme.

24.     Sara Salger ("Salger") is an individual who resides in Madison County, Illinois and works at the Gori Firm's headquarters in Edwardsville, Illinois. She is the Managing Partner at the Gori Firm. Salger is a "person" as defined in 18 U.S.C. § 1961(3), legally distinct from the

Gori Firm.  Salger personally signed and filed numerous complaints and/or discovery responses in cases against J-M Manufacturing that she knew or should have known were objectively baseless or contained false representations.

25.    Erin Beavers ("Beavers") is an individual who resides in Madison County, Illinois and works at the Gori Firm's headquarters in Edwardsville, Illinois.  She is a partner at the Gori Firm who supervised the implementation of the bounty system, conducted training sessions for depo attorneys, and personally signed complaints and discovery responses in cases against J-M Manufacturing.

26.    Jason Steinmeyer ("Steinmeyer") is an individual who resides in Madison County, Illinois and works at the Gori Firm's headquarters in Edwardsville, Illinois.  He is a Partner at the Gori Firm who conducted training sessions for depo attorneys and participated in the implementation of the bounty system.

27.    Christopher Layloff ("Layloff") is an individual who resides in Madison County, Illinois and works at the Gori Firm's headquarters in Edwardsville, Illinois.  He is a partner at the Gori Firm who negotiated and executed batch settlements that bundled objectively baseless "dismissal" cases with cases containing coached and fabricated testimony to extract inflated settlement values.

28.    John and Jane Does 1-25 are partners, associates, or employees of the Gori Firm who participated in the scheme described herein as "depo attorneys" who met with clients, coached testimony, and collected bounty payments, or who otherwise participated in the conduct of the RICO enterprise. J-M Manufacturing will seek leave to amend this complaint to add a subset of these individuals by name when their identities are ascertained through discovery (to the extent

they do not come forward as whistleblowers beforehand and obtain corresponding whistleblower protections).

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (c), and (d).

30.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the RICO claims that they form part of the same case or controversy.  Alternatively, this Court has diversity jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 because J-M Manufacturing is a citizen of Delaware and California, Defendants are citizens of Illinois, and the amount in controversy exceeds $75,000.

31.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because a substantial part of the events giving rise to these claims occurred in this District.  Pursuant to 28 U.S.C. § 1391(d), the Gori Firm resides in this district and conducts significant activities in the district.  According to its website (and searches of the Attorney Registration and Disciplinary Commission of Illinois), for example, approximately 27 lawyers on its website work in Edwardsville, Illinois.

## CHOICE OF LAW

32.    Illinois law governs the state law claims asserted herein.  The Gori Firm is an Illinois professional corporation with its principal place of business in Edwardsville, Illinois.  The Individual Defendants reside and work in Illinois.  The fraudulent scheme was conceived, designed, and implemented in Illinois.  The weekly training sessions of depo attorneys were conducted from Illinois.  The overwhelming majority of the underlying asbestos lawsuits were filed in Illinois state courts (Madison and St. Clair Counties).  Illinois has the most significant

relationship to the parties and the conduct giving rise to this litigation.  Under Illinois choice-of-law principles, Illinois substantive law applies to the state law claims.

## THE FRAUDULENT SCHEME

33.    The Gori Firm is one of the most prolific asbestos litigation law firms in the country.  It initiates and prosecutes lawsuits against various American companies, including J-M Manufacturing, on behalf of individuals alleging personal injuries, including mesothelioma and lung cancer, caused by exposure to asbestos.  The Gori Firm has represented thousands of asbestos claimants and recovered more than $4 billion in asbestos litigation.[5]  Asbestos firms like the Gori Firm generally net 35% to 40% of recoveries in contingency fees.

34.    For years, beginning no later than 2018, the Gori Firm, by and through the Individual Defendants and other attorneys, collectively and in concert, devised, organized, and participated in a fraudulent scheme to defraud the companies who were tort defendants in these asbestos lawsuits, including J-M Manufacturing, through a calculated and deliberate strategy.

35.    J-M Manufacturing was unaware that it was the victim of the Gori Firm's fraudulent scheme and strategy until 2024, when it was approached by a whistleblower who previously worked as a depo attorney at the Gori Firm from approximately 2018 to 2024.  As described in detail in the following sections, the whistleblower provided information about the bounty program, as well as the strategy by which the Gori Firm used frivolous cases to structure batch settlements.

### A.    The "Bounty" System

36.    Beginning no later than 2018, and continuing through at least March 2022, the Gori Firm implemented a "bounty" system for its depo attorneys.  This system created a bonus reward

---

[5] The Gori Law Firm, Mesothelioma Settlements & Asbestos Claim Payouts, https://www.gorilaw.com/mesothelioma/settlements-and-verdicts/.

– a bounty – of up to 2% of total settlement proceeds to deposition attorneys who successfully coached their clients to provide deposition testimony that they were exposed to products belonging to defendants on the Gori Firm's "bounty list."

37.    According to the whistleblower, depo attorneys were paid a relatively low annual salary of approximately $65,000, so their total income was heavily dependent on their "bounties," which often allowed depo attorneys to earn up to $800,000 or $900,000 annually.    This compensation structure transformed certain depo attorneys from ordinary employees into stakeholders in the fraudulent scheme, with overwhelming financial incentives to coach false testimony rather than elicit truthful recollections.

38.    The whistleblower provided several names of companies on the bounty list.  The bounty list consisted of more than a dozen American companies, including but not limited to J-M Manufacturing, American Optical, National Oilwell Varco (formerly Ameron International Corporation), Gagnon Inc., Hercules LLC (formerly Haveg Industries), Sprinkmann Sons Corporation, 3M Company, Graybar Electric Company Inc., MSA Safety Incorporated, Hennessey Industries Inc. (formerly Ammco Tools), Honeywell Safety Products USA Inc. (successor-in-interest to Willson Safety Products), FOSECO Inc., Beazer East, Inc. (formerly Koppers Co. Inc.), Heidelberg USA, Inc., Brand Insulation Co., Metalclad Insulation LLC, Iowa-Illinois Taylor Insulation, Caterpillar Inc., Kent Cigarettes, and Conwed Corp. (collectively "bounty defendants").

39.    The bounty defendants were placed on the list generally because of the perception within the Gori Firm that they were "easy" targets who were willing to pay substantial settlements. As time went on, companies were added to the list if they "pissed off" Gori attorneys.  The bounty system was devised, developed, and implemented by the leadership of the Gori Firm, including

Individual Defendants Gori-Gregory and Salger, and was implemented through Beavers, Steinmeyer, and Layloff (the "lieutenant partners").

40.     For many companies, including J-M Manufacturing, regardless of whether they were on the bounty list, the Gori Firm maintained product identification booklets that contained examples of "good" and "bad" deposition testimony to elicit against these defendants, and projected settlement values depending on nature of the testimony. The Gori Firm also maintained booklets that reflected the different projected payouts from various asbestos bankruptcy trusts.

**B.    The Fraud Playbook**

41.     The scheme begins with the intake process, when Gori attorneys identify a potential asbestos plaintiff. Once a case was referred to the Gori Firm,[6] the whistleblower explained that the Gori partners instructed the depo attorneys to review the client's file and work history and draft a stack of 30 to 40 trust affidavits and mail them in hard copy to the client. These affidavits -- in which the affiant attests to exposure to certain products related to the bankrupt company -- were essential components of the claims seeking compensation that the firm would later submit to the asbestos bankruptcy trusts. The firm provided depo attorneys with booklets listing asbestos trusts from highest to lowest value in terms of payouts.

42.     Next the depo attorney would travel to visit the client, who was typically an elderly person and who was often ill and hospitalized. If the depo attorney flew out on a weekend, the

---

[6] Top referral sources included Sokolove Law LLC ("Sokolove"), Early, Lucarelli, Sweeney & Meisenkothen ("Early"), and Maune Raichle Hartley French & Mudd LLC ("Maune"). These referral sources are entitled to receive between 40 to 60 percent of the contingency fees recovered in any case referred to the Gori Firm, whether through the tort or trust system. Given the Gori Firm's expressed belief that "[a]verage settlements for mesothelioma range from $1 Million to $1.4 Million," lead generators like Sokolove, Early, and Maune stood to gain substantial profit from every referral. J-M Manufacturing anticipates additional discovery will reveal specific instances of fraud and related misconduct on the part of certain referrals firms, who may be added as defendants at a later date.

Gori Firm would pay them an extra bonus of $2,000. The depo attorneys were trained to bring their product identification booklet(s) containing their compilations of bounty defendants (or other high value targets) and related products. If the plaintiff was in particularly bad health, the depo attorney would expedite the visit and bring the trust affidavits instead of mailing them.

43.    During the first meeting with the plaintiff, the depo attorneys were trained to ensure the trust affidavits were signed and to indoctrinate the witness to adopt the recommended product identifications – that is, to affirm that they were exposed to the products of the bankrupt trust companies and the solvent defendant companies. Oftentimes the plaintiff would not recall what products they were exposed to decades ago. The depo attorneys were trained to tell the plaintiff that even though he or she might not be familiar with the various companies, the Gori Firm had done lots of research, and based on their research, the plaintiff was exposed to the products of the defendants recommended for inclusion by the attorney. The depo attorneys would use the booklet to show the client the specific products they were supposed to recognize. The depo attorneys were trained to reassure the plaintiff that they would not be audited and that each trust affidavit would reap thousands in compensation, so they would be leaving money "on the table" if they did not sign them. The plaintiff usually acquiesced to the depo attorney's instructions.

44.    During the first meeting, the depo attorneys were also trained to leave a physical copy of a "product list" with the plaintiff that specified the defendant companies and products that the plaintiff would need to be prepared to recognize in an eventual deposition in the lawsuit. The depo attorneys were trained to instruct the plaintiff, or have a family member instruct the plaintiff, to copy the product list by hand onto a separate sheet of paper so that they could use it as a reference during their deposition. The depo attorneys were trained to instruct the plaintiff to testify during

the deposition that they came up with the list themselves and were not coached, prepared, or provided the list.

45.    The depo attorneys were also trained to retrieve the signed trust affidavits and to delay their submission until two weeks after the plaintiff's deposition in the tort lawsuit. This was so that the firm and the plaintiff could deny submitting any trust claims when asked in discovery or the deposition in the lawsuit. This deliberate concealment was designed to prevent defendants like J-M Manufacturing from discovering inconsistent exposure narratives that would have revealed the fraud.

46.    Next the Gori Firm identifies the tort defendants to name in a lawsuit. The Gori Firm names as many solvent defendants as possible, including bounty defendants and otherwise high-value defendants, which "allows [the firm] to maximize the pool of money [clients] receive compensation from."[7]    The Gori Firm boasts on its website that they name "all possible defendants," and that the average case has more than 60 defendants.[8]

47.    The Gori Firm files each lawsuit in one of a few cherry-picked jurisdictions known to be favorable to asbestos plaintiffs, usually Madison County and St. Clair County in Illinois. This forum shopping is no secret, as it openly states on its website: "We will file your lawsuit in the jurisdiction that is most advantageous to you. . . . Some [states] have more favorable laws than others."[9]    The Gori Firm selectively files in these handpicked jurisdictions because it knows that it is unlikely to be sanctioned for its misconduct and that the courts will allow the firm's cases to sit on the docket for extensive periods of time without forcing the parties to go to trial, which is

---

[7] The Gori Law Firm, Mesothelioma Lawsuits, https://www.gorilaw.com/mesothelioma/lawsuit/.
[8] *Id.*
[9] The Gori Law Firm, Mesothelioma Settlements & Asbestos Claim Payouts, https://www.gorilaw.com/mesothelioma/settlements-and-verdicts/.

essential to the Gori Firm's ability to file, maintain, and ultimately settle a large volume of cases despite the firm's relatively small size.

48.     After a case is filed, the depo attorneys were instructed to make a second visit to the plaintiff to prepare the witness for deposition.  During the second meeting, the depo attorneys were trained to instruct the witness how to answer certain questions posed by defense counsel. The depo attorney instructed the witness to identify exposures to products of the solvent defendants named in the lawsuit, including bounty defendants like J-M Manufacturing.  The depo attorney also taught the witness about necessary testimony required to make an adequate identification, including the relevant years when exposure could have occurred and types of exposure scenarios that were difficult for the defendant to disprove.

49.     Second, the depo attorney instructed the witness that if defense counsel asked whether they filed any trust claims, they should answer that they do not recall because they have signed so much paperwork and do not know what trust claims look like.

50.     Third, when defense counsel attempted to get the plaintiff to admit exposure to products of bankrupt companies, the depo attorneys were trained to shut down the line of questioning.

51.     Additionally, during the second meeting, the depo attorneys were trained to prepare and bring a "depo binder," which contained copies of all the trust affidavits the plaintiff signed. The depo attorneys reviewed the binder with the witness to remind them that they signed these affidavits, and that if asked whether they were exposed to any of these products, they need to say "it sounds familiar," which was sufficiently vague that it (a) would not be usable by the defense to apportion damages as an alternate exposure, but also (b) left open the possibility for the plaintiff to submit trust claims for those products later and survive an audit by the trusts.

52.     Also during the second meeting, depo attorneys were trained to instruct plaintiffs to answer five "close out" questions in the affirmative to "protect the value" of their trust affidavits. These questions were designed to both appease certain trusts that might audit the deposition transcript later, while also preserving the plaintiff's ability after the deposition to file trust claims for certain products even if the plaintiff either denied being exposed to or did not recall being exposed to those products during the deposition.  Those "close out" questions were, to paraphrase: (a) now that you have sat through the deposition, have you disclosed all employers you worked with? (b) now that you have sat through the deposition, have you disclosed all locations you worked at?  If so, (c) are there possibly other products that you worked with but could not recall during your deposition, correct?  If so, (d) if you were showed pictures of these products, that would refresh your recollection, correct?

C.     **The Batch Settlement Strategy**

53.     Armed with these false product identifications and the leverage of having hundreds of plaintiffs in an overburdened asbestos docket, the Gori attorneys could often extract settlements from the bounty defendants, including J-M Manufacturing.  The Gori attorneys typically settled cases in batches by agreeing to settle certain cases ("ID cases") and to dismiss several others "DWOP cases" (dismissal without prejudice) in exchange for an amount of money that the Gori Firm was free to distribute however it saw fit among all of the plaintiffs in the batch.  The largest distributions were often allocated to the top referral firms, irrespective of the merits of the case.

54.     The Gori Firm deliberately filed and used a large volume of DWOP cases—cases it knew were objectively baseless—as "bargaining chips" for batch settlements.  By bundling these sham cases with cases containing coached testimony ("ID cases"), the Gori Firm extracted inflated settlement values while concealing that many of the dismissed cases were filed solely to create negotiating leverage rather than to pursue legitimate claims.  In so doing, the Gori attorneys

understood that the sheer number of pending cases created enormous pressure for J-M Manufacturing to settle cases to avoid a runaway verdict.

55.    J-M Manufacturing believed it was obtaining value by having weak cases dismissed; in fact, those cases were manufactured to create negotiating leverage. This batch settlement strategy was itself fraudulent because it involved misrepresentations and material omissions about the nature of the dismissed cases.

**D.    The No-Poach Agreement**

56.    To further maintain the secrecy of the fraudulent scheme, the Gori Firm entered into no-poach agreements with two other prominent asbestos plaintiff law firms, including Simmons Hanly Conroy LLP and Maune Raichle Hartley French & Mudd LLC.  These agreements prohibited the colluding firms from hiring Gori Firm employees who attempted to leave (and vice versa), thereby deterring potential whistleblowers from departing and exposing the scheme.

**E.    Pre-Litigation Conduct**

57.    The following conduct is independently actionable and occurred before litigation was filed or contemplated, and/or constitutes non-communicative conduct independent of any petitioning activity:

    a.    The Bounty System: The creation, implementation, and operation of the bounty compensation system, which incentivized fraud regardless of any particular lawsuit. The bounty system was a business decision about attorney compensation, not a litigation communication.

    b.    Training Programs: The development and delivery of training programs teaching depo attorneys to elicit false testimony. These training sessions occurred independent of any specific case and were designed to create a general capability for fraud.

c. <u>Product Identification Booklets</u>: The creation and distribution of product identification booklets designed to substitute for client memory. These materials were created as firm resources, not as communications in any particular lawsuit.

d. <u>Trust Affidavit Practices</u>: The practice of sending 30 to 40 trust affidavits to clients for signature before any investigation, and instructing clients to sign affidavits regardless of actual recollection. This pre-litigation practice was designed to manufacture claims, not to communicate in pending litigation.

e. <u>Client Indoctrination</u>: The first meeting with clients during which depo attorneys (and earlier, on information and belief, certain referral sources) coached them to adopt fabricated exposure stories and memorize product lists. This occurred before any deposition or litigation communication.

f. <u>No-Poach Agreements</u>: The agreements with competing firms to deter employees from leaving had no relation to any particular lawsuit.

**F.    Sample Cases Demonstrating the Fraudulent Scheme**

58.    The following sample cases illustrate the fraudulent scheme. Each of these cases was objectively baseless—meaning no reasonable attorney could realistically expect success on the merits—for one or more of the following reasons:

a.    <u>Temporal Impossibility</u>: The plaintiff's or decedent's work history ended before J-M Manufacturing existed in 1983, making exposure to J-M Manufacturing's products legally impossible as a matter of undisputed historical fact.

b. <u>Occupational Impossibility</u>: The plaintiff's occupations had no conceivable nexus to underground pipe. ACP is installed or removed underground by specialized contractors; painters, teachers, pharmacists, and salesmen have no occupational exposure pathway.

c. <u>No ACP Allegation</u>: The complaint itself alleged no exposure to ACP whatsoever. The Gori attorneys named J-M Manufacturing despite having no factual basis related to its only asbestos-containing product.

59.     At all relevant times, the Gori attorneys have known that J-M Manufacturing did not exist or begin supplying ACP until 1983, when it acquired certain PVC-related plants and assets that used to belong to Johns-Manville. The Gori attorneys also have been aware that Johns-Manville is a different company that went bankrupt in 1982 and created a bankruptcy trust to handle personal injury claims associated with its asbestos-containing products, primarily insulation. Indeed, the Gori Firm has an entire page of its website dedicated to explaining the history of Johns-Manville and the trust it formed.[10]

**1.     *Robert Mallam v. A. Schulman, Inc., et al.***

60.     On or about October 10, 2024, the Gori Firm e-filed the complaint in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, in the Circuit Court of Madison County, Illinois. The complaint named approximately 30 defendants, including J-M Manufacturing. Sara Salger, Erin Beavers, Jason Steinmeyer, and Ivan Cason were listed among the attorneys of record and Salger signed the complaint.

---

[10] The Gori Law Firm, John Mansville [sic] Asbestos Trust Fund, https://www.gorilaw.com/mesothelioma/trust-funds/johns-manville-corporation/.

61.    The complaint alleged that Mallam developed mesothelioma as a result of his exposure to asbestos contained in various products made, sold, or distributed by the named defendants, including J-M Manufacturing.  (Compl. ¶¶ 2-3, 11.)  This accusation against J-M Manufacturing was false and objectively baseless because, as the Gori attorneys knew, there was no allegation or evidence that decedent was ever exposed to ACP and his occupations involved no potential exposure to underground pipe.  The lawsuit was therefore brought with subjective intent to gain leverage in batch settlement discussions rather than to obtain relief on the merits.

62.    The complaint was devoid of any allegation that Mallam had been exposed to ACP, much less ACP supplied by J-M Manufacturing.  The complaint does not allege any occupational exposure to asbestos whatsoever.  Instead, the complaint solely alleged that the plaintiff "was exposed to asbestos containing products through the use of talcum powder."  (Compl. ¶ 1.)

63.    On or about February 3, 2025, Sara Salger and Erin Beavers served responses to the defendants' standard asbestos interrogatories, which were signed by Beavers.  The interrogatory responses attached a comprehensive work history reflecting that plaintiff worked between 1990 and 2004 in a variety of jobs including a teacher, laborer, driver, store clerk, painter, and sales representative.  None of the roles involved potential exposure to underground pipe.

64.    The frivolous lawsuit nevertheless has forced J-M Manufacturing to spend significant sums of money to defend against the bogus allegations.

2.    *Robert Ramirez et al. v. 4520 Corp. Inc., et al.*

65.    On or about March 18, 2025, the Gori Firm e-filed the complaint in *Robert Ramirez et al. v. 4520 Corp. Inc., et al.*, No. 25-LA-324, in the Circuit Court of Madison County, Illinois. The complaint named approximately 49 defendants, including J-M Manufacturing.  Sara Salger,

- 21 -

Erin Beavers, Jason Steinmeyer, and Ivan Cason were listed among the attorneys of record and Salger signed the complaint.

66.     The complaint alleged that Ramirez developed mesothelioma as a result of his exposure to asbestos contained in various products made, sold, or distributed by the named defendants, including J-M Manufacturing.  (Compl. ¶¶ 2-3, 11.)  This accusation against J-M Manufacturing was false and objectively baseless because, as the Gori attorneys knew, there was no allegation or evidence that decedent was ever exposed to ACP and his occupations involved no potential exposure to underground pipe.  The lawsuit was therefore brought with subjective intent to gain leverage in batch settlement discussions rather than to obtain relief on the merits.

67.     The complaint was devoid of any allegation that Ramirez had been exposed to ACP, much less ACP supplied by J-M Manufacturing.  Instead, the complaint solely alleged that the plaintiff worked from 1964 to 1968 as a gas station mechanic and drill press operator.  There is no claimed exposure after 1968.  (Compl. ¶ 1.)

68.     On or about April 24, 2025, Sara Salger and Erin Beavers served responses to the defendants' standard asbestos interrogatories, which were signed by Beavers.  The interrogatory responses purport to attach a comprehensive work history reflecting that plaintiff worked from 1964 to 1968 as a gas station mechanic and drill press operator, in the 1970s as a sales associate at Macy's, from 1971 to 1976 as a manager/counselor/director/dean at the University of California, from 1976 to 1980 as a director of housing facilities at Stanford University, and from 1980 to 2002 as a sales manager and corporate vice president for American Building Maintenance.  None of the roles involved potential occupational exposure to underground pipe.

69.     The frivolous lawsuit nevertheless has forced J-M Manufacturing to spend significant sums of money to defend against the bogus allegations.

70.     Additional sample cases demonstrating the fraudulent scheme include cases where the accusations against J-M Manufacturing were objectively baseless because they involved no logical connection to ACP supplied by J-M Manufacturing:

    a.   *Efstratios Mastronikolas v. 4520 Corp. Inc., et al.*, No. 18-L-96 (Madison County, IL): work history had no logical nexus to underground pipe nor allegation of exposure to ACP.

    b.   *Normand Gagnon v. Aerco Int'l, Inc. et al.*, No. 19-L-187 (Madison County, IL): work history ended in 1970s and had no logical nexus to underground pipe nor allegation of exposure to ACP.

    c.   *Robert Nettle et al. v. Agco Corp. et al.*, No. 19-L-415 (Madison County, IL): no evidence of exposure to underground pipe.

    d.   *Anthony Podorski et al. v. AECOM Energy & Construction, Inc. et al.*, No. 20-L-559 (Madison County, IL): work history ended in 1972 and had no allegation of exposure to ACP.

    e.   *Joseph White v. 4520 Corp. Inc., et al.*, No. 20-L-0241 (St. Clair County, IL): work history ended in 1978 and had no logical nexus to underground pipe nor allegation of exposure to ACP.

    f.   *Leila Christman v. AECOM Energy & Constr., Inc. et al.*, No. 20-L-466 (St. Clair County, IL): plaintiff's ex-husband's work history had no allegation of exposure to ACP and couple divorced in 1971.

    g.   *Velma Miller et al. v. 4520 Corp. Inc., et al.*, No. 20-L-0889 (St. Clair County, IL): work history ended in 1977 and no allegation of exposure to ACP.

      h.   *Bobby Pruitt et al. v. 4520 Corp. Inc., et al.*, No. 2422-CC11366 (St. Louis, MO): work history ended in 1978 and had no logical nexus to underground pipe nor allegation of exposure to ACP.

      i.   *Douglas Robb et al. v. Aerco Int'l, Inc. et al.*, No. 24-LA-1535 (St. Clair County, IL): work history had no logical nexus to underground pipe nor allegation of exposure to ACP.

      j.   *Guy Moraski v. 4520 Corp. Inc. et al.*, No. 25-LA-159 (St. Clair County, IL): work history ended in 1979 and no allegation of exposure to ACP.

71.    The frivolous lawsuits above nevertheless forced J-M Manufacturing to spend significant sums of money to defend against and in some cases settle the cases.

      **G.**    **Concealment of the Scheme and Subsequent Discovery**

72.    J-M Manufacturing did not discover, and could not reasonably have discovered through the exercise of due diligence, the fraudulent scheme until 2024 when it was approached by the whistleblower, because:

      a.   <u>Active Concealment</u>: The scheme was designed to avoid detection.

          i.   Plaintiffs were instructed to deny knowledge of trust claims during depositions, preventing defendants from discovering inconsistent exposure narratives.

          ii.   Depo attorneys were instructed to keep the product lists given to plaintiffs confidential, and plaintiffs were instructed to falsely claim they generated the lists, obfuscating evidence of coaching and perjury.

       iii.  Trust claim submissions were intentionally delayed until two weeks after tort depositions specifically to allow plaintiffs to technically deny having filed claims when asked.

       iv.  The no-poach agreements deterred potential whistleblowers from leaving the firm and exposing the scheme.

  b.  <u>Appearance of Ordinary Litigation</u>: Without knowledge of the fraudulent scheme and strategy, the individual lawsuits appeared to be aggressive but ordinary asbestos litigation. Plaintiffs firms routinely name multiple defendants, forum shop, and dismiss weak cases. Only with the whistleblower's insider account did the systematic nature of the bounty program and the deliberate filing of sham cases as "bargaining chips" become apparent.

  c.  <u>No Access to Internal Information</u>: J-M Manufacturing had no access to the Gori Firm's internal training materials and protocols, bounty compensation records, product identification booklets, communications between firm management and depo attorneys, or the firm's case categorization of "ID cases" versus "DWOP cases."

73.    J-M Manufacturing exercised reasonable diligence by defending each case, seeking discovery, and challenging weak claims. But reasonable diligence could not uncover a scheme specifically designed to be invisible and go undetected.

74.    In the alternative, Defendants are equitably estopped from asserting a statute of limitations defense because they took active steps to prevent J-M Manufacturing from discovering the fraud, including:

    a. Instructing plaintiffs to conceal trust claims in discovery.

    b. Timing trust claim submissions to allow false denials.

    c. Instructing plaintiffs to lie about origin of product lists to hide evidence of fabricated testimony.

    d. Maintaining no-poach agreements to deter whistleblowing.

75.    Having actively concealed their fraud, Defendants cannot now benefit from J-M Manufacturing's inability to discover it sooner.

## THE RICO ENTERPRISE

### A.    The Legal Entity Enterprise

76.    The Gori Firm is an ongoing legal entity that constitutes an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4) (the "Gori Firm Enterprise"). The Gori Firm is an Illinois professional corporation engaged in the practice of law, including asbestos personal injury litigation.

77.    At all relevant times, the Gori Firm Enterprise was foreseeably engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(a) through the use of mail and interstate wires. The firm has clients in different states, sues defendants engaged in interstate commerce, and files cases via various state courts' electronic filing systems.

78.    Individual Defendants Gori-Gregory and Salger are "persons" as defined in 18 U.S.C. § 1961(3), legally distinct from the Gori Firm Enterprise. Gori-Gregory is the Principal Partner and Owner; Salger is the Managing Partner.

79.    Gori-Gregory and Salger operated, managed, and directed the affairs of the Gori Firm Enterprise in furtherance of the scheme through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

80.    Gori-Gregory and Salger devise and implement the enterprise's strategy in asbestos litigation described above, including supervising the bounty program.  They hire and fire attorneys, including depo attorneys, and are responsible for the training of depo attorneys.  They set firm policy on case handling; direct firm spending on advertising; negotiate and liaise with referral firms; make decisions about which cases to file, including the filing of objectively baseless lawsuits; and determine settlement or dismissal strategy across multiple cases.

81.    Gori-Gregory and Salger's racketeering was undertaken to benefit the Gori Firm Enterprise:

      a.  The bounty system was designed to increase the firm's case volume, settlement recoveries, and market position as the top filer of asbestos cases.

      b.  The mass filing of objectively baseless cases built the firm's inventory for batch settlement negotiations.

      c.  The no-poach agreements with competing firms protected the secrecy of the scheme.

      d.  The proceeds of the racketeering (contingency fees) flowed to the firm and were reinvested in advertising, hiring, and expansion.

      e.  The Individual Defendants, as equity partners, benefited from the firm's increased profitability, but their primary objective was building the firm's enterprise rather than personal enrichment at the firm's expense.

82.    This structure satisfies the distinctiveness requirement under *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), which held that the RICO statute "requires no more than the formal legal distinction between 'person' and 'enterprise' (namely, incorporation) that is present here." *Id.* at 165.

- 27 -

83. Gori-Gregory and Salger have shared longstanding relationships and have held leadership or managerial roles at the Gori Firm for several years. The Gori Firm Enterprise was of sufficient longevity, has been in continuous operation for over five years, at least as early as 2018, and threatens to continue into the future.

**B.     The Bounty System Enterprise**

84. In the alternative, and pursuant to Fed. R. Civ. P. 8(d)(2)-(3), J-M Manufacturing alleges that the RICO enterprise is an association-in-fact consisting of: (a) Individual Defendants Gori-Gregory and Salger; (b) the lieutenant partners (Beavers, Steinmeyer, Layloff); and (c) the depo attorneys who participated in the bounty system, including John and Jane Does 1-25.

85. This association-in-fact (the "Bounty System Enterprise") is distinct from the Gori Firm itself because:

    a.   The Bounty Structure Created a Separate Venture: The depo attorneys' compensation through the bounty system was not ordinary employment. With base salaries of approximately $65,000 but potential bounty earnings of $800,000-$900,000 annually, the depo attorneys were effectively profit-sharing participants in the fraudulent scheme. Their financial interests were aligned with the success of the fraud, not with the legitimate interests of the firm or its clients. The purpose of the association-in-fact was to maximize recoveries achieved from the batch settlement of cases built on false testimony along with dismissals of objectively baseless cases.

    b.   The Scheme Had Independent Structure: The bounty system enterprise had its own organizational structure and relationships—leadership (Gori-Gregory and Salger), middle management (lieutenant partners), and field operatives (depo attorneys)—that operated in parallel to, but distinct from,

the firm's legitimate asbestos practice (however limited such practice may have been).

    c.   <u>Potentially Adverse to the Firm</u>: By eliciting perjury and filing sham lawsuits, the bounty system participants exposed the Gori Firm to sanctions, malpractice liability, bar discipline, and lawsuits such as this one. The participants pursued their own financial interests through bounties even when those interests conflicted with the firm's legitimate interests in avoiding such liability.

    d.   <u>Continuity Across Cases</u>: The depo attorneys functioned as a continuing unit across hundreds of cases over multiple years. They attended weekly training sessions together, shared methodologies through product identification booklets, and coordinated their practices according to the fraud playbook.

    e.   <u>Structure</u>: The Bounty System Enterprise therefore satisfies the requirements of structure, namely "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

86.     Individual Defendants, including the lieutenant partners, and depo attorneys have shared longstanding relationships for several years. The Bounty System Enterprise was of sufficient longevity, has been in continuous operation for over five years, at least as early as 2018, and threatens to continue into the future in some form or the other to incentivize the fabrication of product identifications.

## PREDICATE ACTS

87.    The Individual Defendants engaged in multiple acts of racketeering activity, including violations of the federal mail fraud statute (18 U.S.C. § 1341) and the federal wire fraud statute (18 U.S.C. § 1343).

88.    In furtherance of the scheme, each Individual Defendant personally and repeatedly transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds; and also placed, or caused to be placed, matters and things in any post office or authorized depository, or deposited or caused to be deposited, matters or things to be sent or delivered by a private or commercial interstate carrier, on hundreds or thousands of occasions.

89.    To name just a few examples, these interstate mail and wire communications included, but were not limited to the following in furtherance of the scheme: interstate emails with referral sources (like Sokolove, Early, and Maune) concerning client leads and intake information; interstate telephone calls and emails between Gori attorneys and potential clients to schedule initial meetings; mailings of trust affidavits to potential clients in advance of initial meetings; electronic submission of bankruptcy trust claims over the internet to trust administrators, many of which are located in other states; electronic filing and service of court filings and discovery over the internet served on lawyers located in various states; interstate emails between attorneys; telephonic and videoconference depositions; telephonic and videoconference training sessions for depo attorneys in various states; and mailings and interstate wires to transmit settlement payments, contingency fees, bounty compensation, travel bonuses, and referral fees.  The details of the foregoing predicate acts are predominantly within the exclusive knowledge and control of Defendants and will be revealed through discovery.

A.    **Predicate Acts by Gori-Gregory**

90.    Gori-Gregory personally committed predicate acts, including but not limited to:

a.    As Principal Partner and Owner, Gori-Gregory approved and authorized the implementation of the bounty system in or before 2018, knowing that it would incentivize depo attorneys to elicit false testimony and material omissions. On information and belief, this authorization was communicated to Gori attorneys in various states via interstate wires.

b.    Gori-Gregory approved the "bounty list" of target defendants, including J-M Manufacturing, knowing that depo attorneys would be financially incentivized to manufacture false exposure identifications against these companies regardless of actual exposure history. On information and belief, this authorization was communicated to firm management via interstate wires.

c.    Gori-Gregory received and reviewed regular reports via interstate wires concerning bounty payouts and settlement recoveries, which demonstrated the success of the fraudulent scheme, and authorized its continuation.

d.    Gori-Gregory caused the issuance of interstate wire payments for bounty payouts and travel bonuses for depo attorneys to effectuate the fraudulent scheme.

e.    Gori-Gregory caused the issuance of interstate wire payments for referral fees owed to firms such as Sokolove, Early, and Maune, to perpetuate the fraudulent scheme. These referrals ensured a steady supply of cases to file, in support of the overall strategy of flooding the courts with a large volume

of asbestos cases to use as bargaining chips and to increase settlement leverage.

    f.   Gori-Gregory participated in communications via interstate wire relating to the filing of objectively baseless lawsuits against J-M Manufacturing and others, including approving the filing of cases where the plaintiff's work history ended before J-M Manufacturing existed, knowing these cases would be used as "dismissal" bargaining chips as part of an overall strategy and fraudulent scheme.

91.    Additional evidence of Gori-Gregory's specific participation in predicate acts is within the exclusive knowledge and control of Defendants and will be revealed through discovery.

**B.**    **Predicate Acts by Salger**

92.    Salger personally committed predicate acts, including but not limited to:

    a.   On or about November 6, 2024, Salger (with Beavers and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio. As an attorney of record, Salger signed the complaint and issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

    b.   On or about November 7, 2024, Salger (with Beavers and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Bobby Pruitt et al. v. 4520 Corp. Inc., et al.*, No. 2422-CC11366, which were transmitted via interstate wire for service on J-M Manufacturing's

- 32 -

agents in California and Missouri.  As an attorney of record, Salger signed the complaint and issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP, the plaintiff's work history ended in 1978, and the work history involved no potential exposure to underground pipe.

c.  On or about November 20, 2024, Salger (with Beavers and Steinmeyer) in Illinois signed and caused to be placed in the mail a Notice of Attorneys' Lien addressed to all defense counsel in *Douglas Robb et al. v. Aerco Int'l, Inc. et al.*, No. 24-LA-1535, requesting that any checks issued in settlement or satisfaction of judgment be made payable to the Gori Firm.

d.  On or about January 13, 2025, Salger (with Beavers and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Douglas Robb et al. v. Aerco Int'l, Inc. et al.*, No. 24-LA-1535, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio.  As an attorney of record, Salger signed the complaint and issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

e.  On or about February 6, 2025, Salger (with Beavers and Steinmeyer) in Illinois signed and caused to be placed in the mail a Notice of Attorneys' Lien addressed to all defense counsel in *Guy Moraski v. John Crane, Inc., et al.*, No. 2025LA000159, requesting that any checks issued in settlement or satisfaction of judgment be made payable to the Gori Firm.

f.  On or about March 13, 2025, Salger (with Beavers and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Guy Moraski v. 4520 Corp. Inc. et al.*, No. 25-LA-159, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio. As an attorney of record, Salger signed the complaint and issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history ended in 1979.

g.  On or about March 31, 2025, Salger (with Beavers and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Robert Ramirez et al. v. 4520 Corp. Inc., et al.*, No. 25-LA-324, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio. As an attorney of record, Salger signed the complaint and issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

h.  On or about April 17, 2025, Salger (with Beavers) in Illinois caused to be electronically filed and served the plaintiff's motion to add case to the August 17, 2026 trial docket in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, which was transmitted via interstate wire to defense counsel in other states. Salger sought to set a trial date despite knowing there was no basis to prosecute the claims against J-M Manufacturing.

      i.   Salger participated in and directed weekly training sessions for depo attorneys, some of which were conducted by video conference (via interstate wire), during which she instructed depo attorneys to coach plaintiffs to falsely identify exposure to bounty defendants.

**C.**    **Predicate Acts by Beavers**

93.    Beavers personally committed predicate acts, including but not limited to:

      a.   On or about November 6, 2024, Beavers (with Salger and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio.  As an attorney of record, Beavers issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

      b.   On or about November 7, 2024, Beavers (with Salger and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Bobby Pruitt et al. v. 4520 Corp. Inc., et al.*, No. 2422-CC11366, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Missouri.  As an attorney of record, Beavers issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP, the plaintiff's work history ended in 1978, and the work history involved no potential exposure to underground pipe.

      c.   On or about January 13, 2025, Beavers (with Salger and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in

*Douglas Robb et al. v. Aerco Int'l, Inc. et al.*, No. 24-LA-1535, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio.  As an attorney of record, Beavers issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

d.   On or about February 3, 2025, Beavers in Illinois signed and caused to be electronically served responses to the defendants' standard asbestos interrogatories in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, which were transmitted via interstate wire to defense counsel in other states. The interrogatory responses attached a work history reflecting that plaintiff worked in occupations (teacher, laborer, driver, store clerk, painter, salesperson) with no conceivable nexus to underground pipe—yet Beavers certified the responses despite knowing they provided no basis for claims against J-M Manufacturing and continued prosecuting the case.

e.   On or about March 13, 2025, Beavers (with Salger and Steinmeyer) in Illinois caused to be electronically served the summons and complaint in *Guy Moraski v. 4520 Corp. Inc. et al.*, No. 25-LA-159, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio.  As an attorney of record, Beavers issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history ended in 1979.

f.  On or about April 24, 2025, Beavers in Illinois signed and caused to be electronically served responses to the defendants' standard asbestos interrogatories in *Robert Ramirez et al. v. 4520 Corp. Inc., et al.*, No. 25-LA-324, which were transmitted via interstate wire to defense counsel in other states.  The interrogatory responses attached a work history reflecting that plaintiff worked in occupations (gas station mechanic, drill press operator, salesperson, academic roles at universities) with no conceivable nexus to underground pipe—yet Beavers certified the responses despite knowing they provided no basis for claims against J-M Manufacturing and continued prosecuting the case.

g.  Beavers, as a leader and partner at the Gori Firm since 2017, conducted periodic training sessions for depo attorneys via videoconference (using interstate wires), including training on identifying "high-value" versus "low-value" defendants and the types of testimony required to maximize settlement values against bounty defendants.

**D.    Predicate Acts by Steinmeyer**

94.    Steinmeyer personally committed predicate acts, including but not limited to:

a.  On or about November 6, 2024, Steinmeyer (with Salger and Beavers) in Illinois caused to be electronically served the summons and complaint in *Robert Mallam v. A. Schulman, Inc.*, No. 24-LA-1345, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio.  As an attorney of record, Steinmeyer issued a summons to J-M Manufacturing despite the fact there was no allegation or

evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

b. On or about November 7, 2024, Steinmeyer (with Salger and Beavers) in Illinois caused to be electronically served the summons and complaint in *Bobby Pruitt et al. v. 4520 Corp. Inc., et al.*, No. 2422-CC11366, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Missouri. As an attorney of record, Steinmeyer issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP, the plaintiff's work history ended in 1978, and the work history involved no potential exposure to underground pipe.

c. On or about January 13, 2025, Steinmeyer (with Salger and Beavers) in Illinois caused to be electronically served the summons and complaint in *Douglas Robb et al. v. Aerco Int'l, Inc. et al.*, No. 24-LA-1535, which were transmitted via interstate wire for service on J-M Manufacturing's agents in California and Ohio. As an attorney of record, Steinmeyer issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history involved no potential exposure to underground pipe.

d. On or about March 13, 2025, Steinmeyer (with Salger and Beavers) in Illinois caused to be electronically served the summons and complaint in *Guy Moraski v. 4520 Corp. Inc. et al.*, No. 25-LA-159, which were transmitted via interstate wire for service on J-M Manufacturing's agents in

California and Ohio.  As an attorney of record, Steinmeyer issued a summons to J-M Manufacturing despite the fact there was no allegation or evidence of exposure to ACP and the plaintiff's work history ended in 1979.

e.  Steinmeyer, drawing on his experience as former Director of the White Collar Crime and Fraud Unit in the St. Louis Circuit Attorney's Office, conducted training sessions for depo attorneys on techniques for "maximizing case values," including methods for coaching plaintiffs to identify widely-known corporate defendants that were easier to "recognize" during depositions.  These sessions were conducted by videoconference via interstate wires.

**E.    Predicate Acts by Layloff**

95.    Layloff personally committed predicate acts, including but not limited to:

a.  On information and belief, between 2018 and 2025, Layloff negotiated with defense counsel via interstate wires (including telephone calls and emails) to achieve dozens of batch settlement agreements with J-M Manufacturing and other defendants. The agreements bundled "ID cases" (cases with coached product identifications) with "DWOP cases" (objectively baseless cases filed solely as bargaining chips), extracting settlement values that exceeded what J-M Manufacturing would have paid had it known the dismissed cases were deliberate shams rather than cases with disputed but potentially meritorious claims.

b.  On or about dates to be determined through discovery, Layloff in Illinois signed and caused to be transmitted via interstate wires to defense counsel in multiple states settlement paperwork, release agreements, and dismissal

stipulations for batch settlements that concealed the fraudulent nature of dismissed cases.

c. Layloff provided training sessions via videoconference (interstate wires) to depo attorneys on techniques for using product identification booklets to coach witnesses. This training included instruction on how to guide plaintiffs through the booklets to "recognize" products they never actually encountered, thereby manufacturing false identifications against bounty defendants including J-M Manufacturing.

96.   In addition to the acts enumerated above, each Individual Defendant was aware that the mails and interstate wires were regularly used to further the scheme.   Each Individual Defendant filed and served, assisted or supervised the filing and serving, and/or was aware that Gori attorneys were filing and serving, the above-referenced complaints or other documents in furtherance of the scheme.   Each Individual Defendant prosecuted, assisted or supervised the prosecuting, and/or was aware that one or more other Gori attorneys were prosecuting the sham lawsuits, including by responding to discovery requests from J-M Manufacturing and others.   And each Individual Defendant sent, assisted or supervised the sending, or was aware that one or more other Gori attorney were sending, communications by mail or e-mail to J-M Manufacturing, the clients, and others regarding the enterprise's lawsuits, settlements, and dismissals.   Accordingly, all Gori attorneys and staff assigned to a given case are equally responsible for causing the transmission of a mail or wire in furtherance of the scheme.

## F.   Pattern of Racketeering

97.   The racketeering activity was repetitive and related.   The racketeering acts were committed for a common purpose: to further the scheme to defraud.   The racketeering acts were aimed at defrauding the same victims (J-M Manufacturing and other tort defendants); were carried

out by the same actors (the Gori attorneys, including Individual Defendants); were designed to inflict similar injuries (forcing defense costs and extracting money through settlements); and were implemented through similar methods of the fraud playbook.

98.    Each predicate act, such as the initial pre-litigation meetings soliciting fabricated product exposures, facilitating bogus bankruptcy trust claim filings, and the filing of objectively baseless complaints, caused a distinct and separate injury to J-M Manufacturing (and other tort defendants) in each case. This pattern of racketeering was so ingrained, consistent, and repetitive that it carries the ongoing threat of repetition and continued harm in the future against J-M Manufacturing and others, particularly since the Gori Firm continues to file lawsuits against J-M Manufacturing and other tort defendants using the fraud playbook.

### THE SHAM LITIGATION EXCEPTION TO NOERR-PENNINGTON

99.    The misconduct in this case extends well beyond routine litigation activity. The majority of lawsuits that the Gori Firm brought against J-M Manufacturing constituted sham litigation that is not entitled to immunity under the *Noerr Pennington* doctrine.

100.    First, these suits, including the ones identified in paragraphs 60 to 70, were objectively baseless, such that no reasonable litigant could expect success on the merits:

        a.    In cases such as *Gagnon*, *Podorski*, *White*, *Christman*, *Miller*, *Pruitt, Moraski*, and *Ramirez*, the plaintiff's or decedent's work history ended before 1983, making exposure to J-M Manufacturing products impossible as a matter of undisputed historical fact. The Gori attorneys knew J-M Manufacturing did not exist until 1983 because (i) they maintain extensive defendant databases; (ii) their website describes Johns-Manville's 1982 bankruptcy; and (iii) they have litigated hundreds of cases against J-M

Manufacturing, and the issue of the timing of J-M Manufacturing's creation has been well established in the parties' briefing.

b.   In cases such as *Mastronikolas* (painter) and *Mallam* (teacher/painter/sales), the plaintiff's occupations had no conceivable nexus to underground pipe installation or removal.

c.   In the majority of these sample cases, the complaint itself alleged no exposure to ACP whatsoever. The Gori attorneys named J-M Manufacturing despite having no factual basis showing exposure to its only asbestos-containing product.

d.   The 96.3% dismissal rate demonstrates that overwhelming majority of filings had no realistic prospect of success.

101.   Second, even if individual cases were not objectively baseless, Defendants forfeited *Noerr-Pennington* protection by making or eliciting knowing and intentional misrepresentations that corrupted the adjudicative process:

a.   <u>Subornation of Perjury</u>: Depo attorneys systematically coached plaintiffs to commit perjury by (i) showing product identification booklets and instructing plaintiffs to "recognize" products they never encountered, (ii) instructing plaintiffs to testify that they developed product lists themselves when in fact attorneys provide them; (iii) instructing plaintiffs to copy product lists by hand to create false evidence of independent recollection; (iv) instructing plaintiffs to falsely deny knowledge of trust claim filings. This is not protected petitioning activity.

      b.  <u>Concealment of Material Evidence</u>: Plaintiffs were instructed to delay trust claim submissions until after tort depositions specifically so they could technically deny having filed claims. This systematic concealment deprived Defendants of evidence material to exposure history and apportionment.

102. Defendants' conduct reflects subjective bad faith – *i.e.*, an effort to weaponize the legal system to interfere with and extract money from J-M Manufacturing. This is not advocacy, it is fraud.

103. Defendants' misconduct did not just impact J-M Manufacturing alone. It drained resources that could have been used to compensate people with asbestos-related disease, increased the likelihood of, or contributed to, the bankruptcy of a number of U.S. companies, impacting many people's jobs and retirements; and wasted judicial resources.

## MATERIALITY, RELIANCE, AND PROXIMATE CAUSE

104. The false representations were material to J-M Manufacturing's litigation and settlement decisions:

      a.  <u>Threshold for Liability</u>: A positive product identification is the threshold requirement for any asbestos claim to survive summary judgment against J-M Manufacturing. Without testimony establishing exposure to J-M Manufacturing's ACP, a plaintiff cannot prove causation. The fabricated identifications were therefore material to whether J-M Manufacturing faced any liability at all.

      b.  <u>Settlement Valuation</u>: J-M Manufacturing evaluated settlement value based on several factors, one of which was the strength of exposure evidence. Cases with positive identifications were valued higher than "DWOP" cases.

By manufacturing positive identifications through coaching, Defendants artificially inflated the perceived value of cases that would otherwise have been dismissed.

c.  Batch Settlement Dynamics: The Gori Firm's practice of bundling "dismissal" cases with "ID" cases in batch settlements concealed that the dismissed cases were deliberate shams.

105.    J-M Manufacturing reasonably relied on the representations made by Defendants in court filings, discovery responses, and deposition testimony.

a.  Court filings and discovery responses are subject to certification requirements (Rule 11 and state equivalent verification/certification requirements) that impose penalties for false statements.

b.  Deposition testimony is given under oath.

c.  J-M Manufacturing had limited independent means to verify exposure histories from events that occurred 30-40 years in the past.

106.    But for Defendants' fraudulent scheme, J-M Manufacturing would not have suffered the injuries alleged herein:

a.  J-M Manufacturing would not have incurred defense costs in the objectively baseless lawsuits that were filed solely as bargaining chips.

b.  J-M Manufacturing would not have paid inflated – or any – settlements in cases where positive identifications were manufactured through the fraud playbook, including witness coaching of perjured testimony.

c.  J-M Manufacturing lost the opportunity to expose the fraud, obtain sanctions, and deter future misconduct because the scheme was specifically designed to conceal itself.

## CLAIMS FOR RELIEF

### COUNT I

**RICO Violation (18 U.S.C. § 1962(c)) – Legal Entity Enterprise
(Against Individual Defendants Gori-Gregory and Salger)**

107.    J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

108.    Each Individual Defendant Gori-Gregory and Salger is a "person," as the term is defined in 18 U.S.C. §§ 1961(3) and 1962(c), legally distinct from the Gori Firm Enterprise.

109.    The Gori Law Firm is an ongoing legal entity enterprise, as the term is defined in 18 U.S.C. § 1961(4).  At all times alleged herein, the Gori Firm Enterprise was engaged in, and its activities affected, interstate commerce.  The Gori Firm has filed lawsuits in Illinois, California, Louisiana, Missouri, New York, and Pennsylvania, and those lawsuits have included defendants from all corners of the United States.

110.    Gori-Gregory and Salger conducted and participated, directly or indirectly, in the operation or management of the Gori Firm Enterprise's affairs through a "pattern of racketeering activity," as defined in 18 U.S.C. §§ 1961(1) and (5), namely multiple acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) as specifically alleged herein.

111.    The racketeering was undertaken to benefit the Gori Firm Enterprise: the bounty system increased the firm's case volume and settlement recoveries; the mass filing of objectively baseless cases built the firm's inventory for batch settlement negotiations; the proceeds of the

settlements flowed to the firm and were reinvested in advertising, hiring, and expansion; and the Individual Defendants' primary objective was building the firm's enterprise.

112.    This structure satisfies the distinctiveness requirement under *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

113.    In conducting the affairs of the Gori Firm Enterprise, Gori-Gregory and Salger each engaged in multiple acts of racketeering activity, including violations of the federal mail fraud statute (18 U.S.C. § 1341) and the federal wire fraud statute (18 U.S.C. § 1343).

114.    The predicate acts were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the scheme to defraud.  The predicate acts were continuous in that they have occurred on a regular basis, affected numerous civil lawsuits and, on information and belief, remain ongoing in cases against J-M Manufacturing and others.

115.    The members of the Gori Firm Enterprise are likely to continue to engage in racketeering activity in their efforts to profit from the scheme.  The Gori Firm has active asbestos lawsuits, including ones against J-M Manufacturing, and continues to file asbestos lawsuits.

116.    By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property.  Specifically, J-M Manufacturing has been proximately caused to expend substantial money and resources to defend claims that were based on misrepresentations and/or were objectively baseless, and to enter and/or satisfy settlements that were inflated due to the pattern of racketeering activity.

117.    By reason of its injury from this violation of 18 U.S.C. § 1962(c), J-M
Manufacturing is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages,
attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT II

### RICO Violation (18 U.S.C. § 1962(c)) – Association-in-Fact Enterprise
### (Against Individual Defendants)

118.    J-M Manufacturing incorporates herein by reference each and every allegation in
the foregoing paragraphs.

119.    In the alternative, and pursuant to Fed. R. Civ. P. 8(d)(2)-(3), J-M Manufacturing
alleges that the Individual Defendants, including the lieutenant partners (Beavers, Steinmeyer,
Layloff), together with the depo attorneys who participated in the bounty system, are a group of
individuals associated in fact ("Bounty System Enterprise"), and who willingly and knowingly
conducted and participated in that association-in-fact enterprise through a pattern of racketeering
activity that affected interstate commerce.

120.    Each Individual Defendant is a "person," as the term is defined in 18 U.S.C.
§§ 1961(3) and 1962(c), legally distinct from the enterprise.

121.    This Bounty System Enterprise is distinct from the Gori Firm itself because: (a) the
bounty structure created a separate venture with depo attorneys as profit-sharing participants;
(b) the scheme had independent organizational structure; and (c) the depo attorneys functioned as
a continuing unit across scores of cases over multiple years.

122.    Individual Defendants and the depo attorneys associated for the common purpose
of reaping financial rewards.  Using the bounty program, Individual Defendants and depo attorneys
worked together to generate, file, and prosecute hundreds of asbestos claims against J-M
Manufacturing and others.  Armed with false product identifications on the one hand, and a large

volume of objectively baseless cases to use as bargaining chips on the other, the Individual Defendants bundled these cases in batch settlements, extracting inflated sums while concealing that many of the dismissed cases were deliberate shams.

123.    Each Individual Defendant conducted, or participated in the management or operation of, the enterprise's affairs.  The Individual Defendants, through the Bounty System Enterprise, engaged in a pattern of racketeering activity, namely multiple acts of mail fraud and wire fraud as specifically alleged herein.

124.    The predicate acts were related in that they shared the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events, but rather regular and integral steps in furtherance of the scheme to defraud J-M Manufacturing.  The predicate acts were continuous in that they have occurred on a regular basis, affected numerous civil lawsuits and, on information and belief, remain ongoing in cases against J-M Manufacturing and others.

125.    The members of the association-in-fact enterprise are likely to continue to engage in racketeering activity in their efforts to profit from the scheme.

126.    By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(c), J-M Manufacturing has been injured in its business and/or property.

127.    Specifically, Individual Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused J-M Manufacturing to expend substantial money and resources to defend claims based on false information and enter and/or satisfy settlements or judgements that were inflated due to the pattern of racketeering activity.

128.   By reason of its injury from this violation of 18 U.S.C. § 1962(c), J-M Manufacturing is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT III

### RICO Violation (18 U.S.C. § 1962(a)) – Investment of Racketeering Proceeds
### (Against the Gori Firm)

129.   J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

130.   The Gori Firm is a "person," as the term is defined in 18 U.S.C. §§ 1961(3) and 1962(a), because it is capable of holding a legal or beneficial interest in property.

131.   The Gori Firm received income derived, directly or indirectly, from the pattern of racketeering activity in the form of contingency fees from settlements obtained through: (a) cases where positive product identifications were manufactured through false testimony; and (b) batch settlements where objectively baseless "dismissal" cases were used as bargaining chips to inflate overall settlement values.

132.   On information and belief, this racketeering income totaled tens of millions of dollars over the relevant period.

133.   The Gori Firm used or invested, directly or indirectly, all or portions of such income, and the proceeds of such income, in the operation of the Gori Firm Enterprise, in violation of 18 U.S.C. § 1962(a).

    a.   Advertising and Marketing: The firm invested racketeering proceeds in national advertising campaigns to capture additional asbestos plaintiffs. The

firm's ads tout its status as the "#1 filer of asbestos cases,"[11] a position achieved through reinvestment of fraud proceeds.

b. Bounty Payments: The firm used racketeering proceeds to fund the bounty payments to depo attorneys—the very compensation structure that incentivized the fraudulent scheme. Annual bounty payments to depo attorneys totaled millions of dollars.

c. Hiring and Expansion: The firm used racketeering proceeds to hire additional depo attorneys, expand training programs, and open offices in multiple states, thereby scaling its capacity to prosecute fraudulent claims.

d. Operational Costs: The firm used racketeering proceeds to fund travel budgets for depo attorneys, develop and maintain product identification booklets, and sustain the infrastructure of the fraudulent scheme.

134. These uses and investments of racketeering income caused injury to J-M Manufacturing separate from the underlying predicate acts:

a. The reinvestment in advertising generated additional fraudulent cases against J-M Manufacturing that would not otherwise have been filed;

b. The funding of bounty payments sustained the incentive structure that caused depo attorneys to elicit false testimony;

c. The expansion of the firm's capacity resulted in increased volume of fraudulent filings against J-M Manufacturing.

---

[11] The Gori Law Firm, Asbestos Claims: How We Can Help, https://www.youtube.com/watch?v=-3oAJ6q8k-o.

135.    As a result of its investment decisions, the Gori Firm's annual filings against J-M Manufacturing roughly doubled between 2018 and 2020, and following a spate of dismissals, roughly tripled between 2021 and 2025, directly causing quantifiable increases in J-M Manufacturing's defense expenditures and inflated settlements during those years.  These injuries were caused by the Gori Firm's use and investment of racketeering income, not merely the underlying predicate acts.

136.    By reason of the Gori Firm's violation of 18 U.S.C. § 1962(a), J-M Manufacturing has been injured within the meaning of 18 U.S.C. § 1964(c) in its business and/or property and is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT IV

### Conspiracy to Violate RICO (18 U.S.C. §§ 1962(a), (d))
### (Against All Defendants)

137.    J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

138.    Beginning no later than 2018, and continuing through the present, the Gori Firm and Individual Defendants unlawfully, knowingly and intentionally conspired and agreed to violate the provisions of 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d).

139.    The conspirators agreed that the Gori Firm would receive income derived from the pattern of racketeering activity (contingency fees from fraudulently obtained settlements) and would use and invest that income in the continued operation of the Gori Firm Enterprise. Each conspirator knew that racketeering proceeds would be reinvested in advertising, bounty payments, hiring, and expansion, and agreed to this reinvestment as part of the overall scheme.

140.     Under *Salinas v. United States*, 522 U.S. 52, 63-64 (1997), a defendant may be liable for RICO conspiracy if they agreed to facilitate the scheme, even if they did not personally commit two predicate acts.  Each Defendant agreed to facilitate the conspiracy.  At all relevant times, each Defendant knew about and agreed to facilitate the overall purpose of the scheme.

141.     In furtherance of their conspiracy to violate the provisions of 18 U.S.C. § 1962(a), the Gori Firm and its attorneys committed overt acts by, inter alia, using or investing such income derived from the pattern of racketeering to pay for advertising and marketing for the Gori Firm to capture more asbestos plaintiffs on whose behalf the firm can file more (largely frivolous) cases against J-M Manufacturing, and to pay for bounties and salaries for Gori attorneys to prosecute such frivolous cases against J-M Manufacturing and others.

142.     By reason of the Gori Firm's violation of 18 U.S.C. § 1962(d), J-M Manufacturing has been injured in its business and/or property and is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

### COUNT V

### Conspiracy to Violate RICO (18 U.S.C. §§ 1962(c),(d))
### (Against Individual Defendants)

143.     J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

144.     Beginning in or before 2018, and continuing through the date of this complaint, the Individual Defendants unlawfully, knowingly and intentionally conspired and agreed together to conduct and participate, directly and/or indirectly, in the conduct of the affairs of the Gori Enterprise identified above through a pattern of racketeering activity that involved mail fraud and wire fraud, in violation of 18 U.S.C. § 1962(d).

145.    The conspirators agreed that the Individual Defendants would conduct the affairs of the Gori Firm Enterprise through a pattern of racketeering activity. Each conspirator played a role in the agreed-upon scheme: Gori-Gregory and Salger directed overall strategy; Beavers, Steinmeyer, and Layloff implemented the scheme through training, supervision, and settlement negotiations.

146.    At all relevant times, each Individual Defendant knew about and agreed to facilitate the overall purpose of the scheme, which was to defraud J-M Manufacturing and others through filing and prosecuting sham asbestos lawsuits to extract settlements. Each Individual Defendant knew about and agreed that one or more conspirators would commit at least two predicate acts in furtherance of the scheme, including but not limited to the predicate acts enumerated herein.

147.    The Individual Defendants conspired to unlawfully extract settlement payments and verdicts from J-M Manufacturing and otherwise cause the company to spend money to defend claims that were based on misrepresentations, material omissions, and/or were objectively baseless.

148.    By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(d), J-M Manufacturing has been injured in its business and/or property and is entitled to equitable relief under 18 U.S.C. § 1964(a), as well as treble damages, attorneys' fees, costs, and interest on all of the foregoing under 18 U.S.C. § 1964(c).

## COUNT VI

## Common Law Fraud
## (Against All Defendants)

149.    J-M Manufacturing incorporates herein by reference each and every allegation in the foregoing paragraphs.

150.    In furtherance of their scheme, and during the course of their racketeering activity, Defendants made and/or elicited repeated and knowing false statements of fact, including assertions that asbestos plaintiffs were exposed to J-M Manufacturing's ACP, that such exposure caused the asbestos plaintiffs to become sick, and that their lawsuits were being brought in good faith.  Defendants made and/or elicited these misrepresentations with the intent to induce J-M Manufacturing to spend money defending against the claims and entering into inflated settlements.

151.    Defendants' sham lawsuits were predicated on pre-litigation indoctrination whereby Gori depo attorneys were trained to teach, and did teach, putative asbestos plaintiffs to fabricate their product exposure stories and to falsely testify they did not recall any trust claims they filed.

152.    Defendants made or caused to be made material, important, and knowing misrepresentations and/or omissions of fact in those cases, with the intent that J-M Manufacturing rely and act upon them.

153.    J-M Manufacturing had a right to rely upon, and acted in reasonable and/or justifiable reliance upon, the fraudulent misrepresentations and nondisclosures of Defendants.

154.    As a proximate result of Defendants' fraudulent misrepresentations and nondisclosures, J-M Manufacturing suffered compensatory damages in an as yet undetermined amount to be proven at trial, which exceeds $75,000, exclusive of interests and costs.

**COUNT VII**

**Unjust Enrichment**
**(Against All Defendants)**

155.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

156.    Defendants obtained money from J-M Manufacturing through the wrongful conduct described herein, including settlement payments induced by fraud and defense costs imposed through sham litigation.

157.    J-M Manufacturing conferred benefits on Defendants in the form of contingency fees derived from settlements that were: (a) induced by fraudulent misrepresentations about exposure history; and/or (b) inflated by the inclusion of objectively baseless cases as "bargaining chips."

158.    Defendants knew of and appreciated these benefits, as evidenced by their reinvestment of settlement proceeds into the scheme through advertising, bounty payments, and expansion.

159.    It would be unjust, inequitable, and contrary to principles of good conscience for Defendants to retain these benefits because they were obtained through fraud, perjury, and other wrongful conduct.

160.    Alternatively, to the extent Defendants argue that the settlements were governed by express contracts, J-M Manufacturing seeks rescission of those contracts based on fraud in the inducement, and restitution of all amounts paid thereunder.

161.    J-M Manufacturing is entitled to disgorgement and restitution of all amounts wrongfully obtained by Defendants.

## COUNT VIII

### Civil Conspiracy
### (Against All Defendants)

162.    J-M Manufacturing incorporates the preceding paragraphs as if fully set forth herein.

163.    Defendants knowingly and unlawfully conspired and agreed with each other and with certain depo attorneys to commit the following underlying torts:

    a.   Common law fraud (Count VI).

    b.   Abuse of process, by using the litigation system for purposes other than resolving legitimate disputes—namely, to manufacture bargaining chips and extract settlements through volume rather than merit.

    c.   Intentional interference with business relations, by targeting J-M Manufacturing with sham litigation designed to drain resources and force settlements.

164.    The conspiracy had the following elements:

    a.   An agreement between two or more persons (the Individual Defendants and the depo attorneys).

    b.   To participate in an unlawful act (coaching perjury, filing sham lawsuits, making fraudulent misrepresentations);

    c.   An injury caused by an unlawful overt act performed in furtherance of the agreement;

    d.   The overt acts were done pursuant to and in furtherance of the common scheme.

165.    Certain depo attorneys had a substantial personal stake in the conspiracy because they expected to earn outsized monetary rewards ("bounties") if their cases resulted in settlements against bounty defendants.

166.    J-M Manufacturing suffered damages as a proximate result of the conspiracy, including defense costs, inflated settlements, and diversion of business resources.

## PRAYER FOR RELIEF

J-M Manufacturing requests that the Court enter judgment in its favor and against Defendants, to include:

a.    Compensatory damages in an amount to be determined at trial.

b.    Trebled damages attributable to the RICO claims, as permitted by 18 U.S.C. § 1964.

c.    Punitive damages on the damages attributable to the common law fraud and common law conspiracy claims.

d.    Disgorgement to the benefit of J-M Manufacturing of the benefits received by Defendants unjustly.

e.    Attorney's fees, costs, and pre- and post-judgment interest.

f.    An injunction prohibiting Defendants from continuing to perpetrate their fraudulent scheme against J-M Manufacturing.

g.    Such other relief as justice may require.

In connection with the requested relief, J-M Manufacturing demands a jury trial on all issues so triable.

Dated:  January 28, 2026                    Respectfully Submitted,


/s/ Garreth DeVoe
Ashwin J. Ram (ARDC No. 6286478) (*Admission Pending*) (Lead Counsel)
Garreth A. DeVoe (ARDC No. 6340362)
Buchalter LLP
180 North LaSalle Street, Suite 3300
Chicago, IL 60601-2808
Telephone:  (312) 980-5760
aram@buchalter.com

David H. Chao (*Pro Hac Vice Application Pending*)
Buchalter LLP
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730

Telephone:  (213) 891-5032
dchao@buchalter.com

Frank Fletcher (*Pro Hac Vice Application Pending*)
General Counsel
J-M Manufacturing Company, Inc. d/b/a JM Eagle
5200 W. Century Boulevard
Los Angeles, CA 90045

*Counsel for J-M Manufacturing Company, Inc.*