**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | | |
|---|---|---|
| J-M MANUFACTURING COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:26-cv-00094-SPM |
| THE GORI LAW FIRM, BETH | ) | |
| GORI-GREGORY, SARA SALGER, ERIN | ) | Hon. Stephen P. McGlynn |
| BEAVERS, JASON STEINMEYER, | ) | District Judge |
| CHRISTOPHER LAYLOFF, and JOHN AND | ) | |
| JANE DOES 1-25, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF J-M MANUFACTURING COMPANY, INC.'S
MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF RELEVANT ALLEGATIONS.................................................................3

1.    The Bounty Program .................................................................................................4

2.    The Sample Cases.....................................................................................................5

3.    Volume and Settlement Pressure...............................................................................6

4.    A No-Poach Agreement Protects the Scheme From Disclosure ................................6

LEGAL STANDARD...........................................................................................................6

ARGUMENT........................................................................................................................7

I.    *Noerr-Pennington* Does Not Immunize the Gori Firm's Conduct....................................7

   A.    J-MM Need Only Plausibly Allege Sham Litigation, Not Prove It.......................7

   B.    The Complaint Plausibly Alleges Objectively Baseless Litigation in Eight Sample Cases ..................................................................................................................8

   C.    The Complaint Plausibly Alleges Material Misrepresentations That Altered the Outcome of the Underlying Proceedings ...........................................................11

II.    COUNTS ONE AND TWO STATE VALID CLAIMS UNDER § 1962(c) ...................13

   A.    The "Person/Enterprise" Distinctness Argument Misreads the Complaint ..........13

   B.    The Complaint Pleads a Common Purpose for Both the Legal-Entity Enterprise (Count One) and the Association-in-Fact Enterprise (Count Two)......................14

      1.    Count One (Legal-Entity Enterprise): No Additional "Purpose" Showing Is Required........................................................................................................14

      2.    Count Two (Association-in-Fact): The Bounty System's Structure and Goals Are Separate from the Predicate Acts.............................................................15

   C.    The Bounty System Has a Distinct Organizational Structure (Count Two) .........16

   D.    Rule 9(b) Is Satisfied as to the Pattern of Racketeering Activity.........................16

      1.    The Governing Standard Is Flexible and Relaxed Where Information Is in Defendants' Exclusive Control .............................................................................16

i

       2.     Two Specific Affirmative Misrepresentations: The *Mallam* and *Ramirez* Complaints ...................................................................................17

       3.     Defendants' Other Rule 9(b) Arguments Misread the Complaint ............19

   E.    Wire Fraud and Mail Fraud Committed in Litigation Are Predicate Acts............20

   F.    Each Individual Defendant Is Tied to Dated, Document-Anchored Acts of Operation and Management ................................................................................21

III.   COUNT THREE STATES A VALID CLAIM UNDER § 1962(a) ...............................24

   A.    The Seventh Circuit Has Not Required Investment-Use Injury, and the Statutory Text Supports J-MM ......................................................................................24

   B.    The Allegation of Targeted Reinvestment Against the Same Plaintiff Satisfies Any Heightened Standard ...............................................................................25

IV.   COUNTS FOUR AND FIVE STATE VALID CONSPIRACY CLAIMS UNDER § 1962(d).......................................................................................................26

V.   THE STATE-LAW COUNTS SURVIVE.................................................................27

   A.    The Common-Law Fraud Count Survives ..........................................................27

   B.    The Unjust-Enrichment and Civil-Conspiracy Counts Rise with the Underlying Tort and RICO Counts ....................................................................................28

CONCLUSION..................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................... 7

*Baker v. IBP, Inc.*,
357 F.3d 685 (7th Cir. 2004) ................................................................................ 13, 14

*Boyle v. United States*,
556 U.S. 938 (2009) .............................................................................................. 15, 16

*Brittingham v. Mobil Corp.*,
943 F.2d 297 (3d Cir. 1991) ................................................................................. 25, 26

*Brouwer v. Raffensperger, Hughes & Co.*,
199 F.3d 961 (7th Cir. 2000) ................................................................................... 26

*Busby v. Crown Supply, Inc.*,
896 F.2d 833 (4th Cir. 1990) ................................................................................... 25

*Cardenas v. RIA Tele., Inc.*,
2001 WL 536043 (N.D. Ill. May 18, 2001)............................................................. 14

*Connick v. Suzuki Motor Co.*,
174 Ill. 2d 482 (1996)............................................................................................. 27

*Corley v. Rosewood Care Ctr., Inc.*,
142 F.3d 1041 (7th Cir. 1998) ............................................................................ 6, 16

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) ................................................................................... 13

*Deck v. Engineered Laminates*,
349 F.3d 1253 (10th Cir. 2003)............................................................................... 20

*Evans v. City of Chicago*,
434 F.3d 916 (7th Cir. 2006) ............................................................................ 19, 26

*Foman v. Davis*,
371 U.S. 178 (1962) ................................................................................................ 28

*Ford Motor Company v. Knight Law Group*,
2025 WL 3306280 (C.D. Cal. Nov. 24, 2025)........................................................ 10

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) ......................................................................................23, 26

*Int'l Star Registry of Ill., Ltd. v. RGIFTS Ltd.*,
  2025 WL 2766304 (N.D. Ill. Sept. 26, 2025) ..........................................................................7

*J-M Mfg. v. Simmons Hanly Conroy*,
  2025 WL 843854 (N.D. Ill. Mar. 18, 2025) ..........................................................................13

*Kim v. Kimm*,
  884 F.3d 98 (2d Cir. 2018) ...................................................................................20, 21

*Living Designs, Inc. v. E.L. Dupont de Nemours and Co.*,
  431 F.3d 353 (9th Cir. 2005) ..........................................................................................20

*Luna v. 4C Kinzie Investor LLC*,
  2019 WL 1239770 (N.D. Ill. March 18, 2019) ........................................................................14

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
  62 F.3d 967 (7th Cir. 1995) ..........................................................................................21

*Menzies v. Seyfarth Shaw LLP*,
  943 F.3d 328 (7th Cir. 2019) ...........................................................................................6

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) .....................................................................................11, 12

*Navient Solutions, LLC v. Law Offices of Jeffrey Lohman, P.C.*,
  2020 WL 1867939 (E.D. Va. Apr. 14, 2020) ...........................................................................7

*Peterson v. Village of Downers Grove*,
  103 F. Supp. 3d 918 (N.D. Ill. 2015)..................................................................................27

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) ............................................................................... 6, 16, 19

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
  508 U.S. 49 (1993) ......................................................................................... 8, 10, 11

*Rackemann v. LISNR, Inc.*,
  2018 WL 4574342 (S.D. Ind. Sept. 24, 2018) .........................................................................7

*Rao v. BP Prods. N. Am., Inc.*,
  589 F.3d 389 (7th Cir. 2009) .........................................................................................23

*Ratfield v. U.S. Drug Testing Laboratories, Inc.*,
  2024 WL 640955 (N.D. Ill. Feb. 15, 2024)...........................................................................13

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .................................................................................. 21, 23

*Rocha v. FedEx Corp.*,
  15 F. Supp. 3d 796 (N.D. Ill. 2014) ................................................................. 14

*Salinas v. United States*,
  522 U.S. 52 (1997) ...................................................................................... 26, 27

*Stachon v. United Consumers Club, Inc.*,
  229 F.3d 673 (7th Cir. 2000) ..................................................................... 14, 15

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ............................................................................ 6

*Tocco v. Richman Greer Pro. Ass'n*,
  553 F. App'x 473 (6th Cir. 2013) ............................................................... 13, 27

*Uber Technologies v. Simon & Simon, P.C.*
  2026 WL 1284178 (E.D. Pa. May 11, 2026)......................................... 9, 10, 11, 21

*United States v. Griffin*,
  660 F.2d 996 (4th Cir. 1981) ............................................................................ 14

*United States v. Turkette*,
  452 U.S. 576 (1981) .......................................................................................... 15

*Vicom, Inc. v. Harbridge Merchant Services, Inc.*,
  20 F.3d 771 (7th Cir. 1994) .............................................................................. 24

*White v. Hill*,
  2023 WL 4491469 (S.D. Ill. 2023) ................................................................... 26

**Statutes**

18 U.S.C. § 1341 ................................................................................................... 19

18 U.S.C. § 1343 ................................................................................................... 19

18 U.S.C. § 1961 ................................................................................................... 20

18 U.S.C. § 1962 .............................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 6, 7

Fed. R. Civ. P. 15(a)(2) ........................................................................................................28

**INTRODUCTION**

Lawyers are not above the law. Defendants would have this Court hold that, by virtue of their membership in the bar, they enjoy super-immunity from running a racketeering enterprise that suborns perjury, conceals evidence, and runs a coordinated, multi-year fraud scheme to extract settlements on baseless cases. Nothing in the RICO statute, Supreme Court precedent, or any controlling Seventh Circuit authority supports that result.

Although asbestos-related illness has long been on the decline, no one disputes that mesothelioma is a terrible disease. But human tragedy is no license for fraud. The fact that a plaintiff has contracted mesothelioma does not mean the Gori Firm ("the Firm") is allowed to invent a fact pattern and teach a witness to lie in order to extract settlements from chosen target companies. Teaching another person to lie, extracting a payment from a third party based on the telling of that lie, and splitting the proceeds recovered—that is criminal. A license to practice law should never allow anyone to commit criminal acts. The Complaint pleads, in detail, that the Firm built its business model around exactly that fraudulent scheme: filing objectively baseless cases against companies on a "bounty list," paying its deposition attorneys "up to 2% of total settlement proceeds" to teach plaintiffs to "recognize" products they had never encountered, and instructing clients to suppress bankruptcy-trust evidence so the manufactured product identification could survive cross-examination. Compl. ¶¶ 36-52.

J-M Manufacturing ("J-MM") was on the bounty list. *Id.* ¶ 38. The Firm filed approximately 434 lawsuits against J-MM between 2018 and the filing of this Complaint, and voluntarily dismissed roughly 418 of them—a staggering 96.3 % dismissal rate. *Id.* ¶ 4. The Firm used the threat of mass trials to extract batch settlements on cases it knew lacked merit. *Id.* ¶ 4. Many of these cases involved plaintiffs whose work histories ended years *before J-MM existed*.

*Id.* ¶ 21. Some never alleged exposure to asbestos-cement pipe at all. *Id.* ¶ 58(c). Bankruptcy-trust claims were strategically delayed so plaintiffs could deny having filed them. *Id.* ¶ 16. All the while, the Firm maintained an anti-competitive "no-poach" agreement with two other plaintiff's asbestos firms to keep the scheme from unraveling. *Id.* ¶ 56.

Defendants ask this Court to grant immunity to that conduct on the pleadings. They do not contest the dismissal rate. They do not deny the bounty payments. Instead, Defendants' Memorandum searches for numerous escape hatches through which the Firm would escape accountability for its misconduct.

This Court need not, and should not, allow such evasion. Contrary to Defendants' suggestion, *Noerr-Pennington* does not immunize filing baseless lawsuits—certainly not at the motion-to-dismiss stage. Indeed, a recent decision confirms that unscrupulous attorneys who run law firms as racketeering enterprises cannot use *Noerr-Pennington* as a shield. *See Uber Technologies v. Simon & Simon, P.C.*, 2026 WL 1284178 (E.D. Pa. May 11, 2026).

Defendants' statutory arguments fare no better. Muddling their arguments on Counts One and Two, Defendants claim that J-MM has not shown distinctness or purpose. But the structure of Count One—with individual defendants as the "persons" and the Firm solely as the enterprise—has been expressly blessed by the Supreme Court, and the Seventh Circuit requires no further showing of purpose. Count Two, which alleges an association-in-fact enterprise, also plausibly alleges an organizational structure and purpose. The Firm-as-person designation appears only in Count Three, the § 1962(a) investment count, where it belongs. Defendants' attempt to shirk accountability for the individual Defendants fails as well; the Complaint pleads their fraudulent acts with the requisite specificity.

2

Finally, Defendants revert to their staggering claim, unsupported by statute or precedent, that a years-long campaign of criminal fraud is not cognizable merely because it occurred in the context of litigation. Contrary to Defendants' suggestion, fraud does not magically transform into non-fraud when a lawyer employs it in a money-making litigation scheme. This Court cannot allow Defendants to invent a "litigation immunity" to pardon their criminal enterprise.

Lawyers are not above the law. Fraud committed by lawyers is still fraud. A law firm that commits acts of racketeering is a RICO enterprise.

The Motion should be denied.

## STATEMENT OF RELEVANT ALLEGATIONS

Asbestos began to disappear from the marketplace four decades ago, and asbestos-related illness has been on the decline since the 1990s. Compl. ¶ 1. J-MM did not exist before 1983. Compl. ¶ 21. Although it shares the "J-M" mark with the bankrupt Johns-Manville Corporation— a fact the Gori Firm's own marketing materials prominently describe (*Id.* ¶ 88)—J-MM was a separate Delaware corporation that supplied asbestos-cement pipe ("ACP") to water districts only between 1983 and 1988. *Id.* ¶¶ 21, 59. The only context in which any J-MM product could create exposure was improper underground ACP installation by pipefitters or laborers. *E.g.*, *id.* ¶ 58(b). J-MM sold no ACP after 1988 and, since 1998, has produced only PVC and high-density polyethylene pipe. *Id.* ¶ 21.[1]

---

[1] While not explicitly alleged in the complaint, Plaintiff offers this additional context for the Court's understanding. J-MM supplied asbestos-cement pipe ("ACP") solely to experienced pipe installers typically to be installed in water districts that mandated or approved the use of ACP. Multiple federal, state and local regulators had determined that so long as ACP, which was a controlled product, was installed in a legal manner and according to widely publicized manufacturer guidelines, it was safe to install. Such guidelines had been in place for a decade when J-MM began supplying ACP. ACP supplied by J-MM could create impermissible exposure only by cutting the ACP with an unventilated power saw, a practice which had been outlawed for a decade before J-MM came into existence.  For decades, ACP was cut with manual wheel cutters

3

The Gori Law Firm, P.C. is an Illinois professional corporation headquartered in Edwardsville. *Id.* ¶ 22. Beth Gori-Gregory is its Principal Partner and Owner; Sara Salger has served as Managing Partner since 2016; Erin Beavers, Jason Steinmeyer, and Christopher Layloff are partners. *Id.* ¶¶ 23–27.

### 1.    The Bounty Program

Beginning no later than 2018, Defendants implemented the so-called "bounty" system, a scheme to reward attorneys for directing plaintiffs to give false testimony. Compl. ¶ 36. Under that system, deposition attorneys ("depo attorneys") received bonuses of "up to 2% of total settlement proceeds" for teaching plaintiffs to provide deposition testimony that they had been exposed to products of companies on a "bounty list." *Id.* The list named more than a dozen target defendants, including J-MM. *Id.* ¶ 38. The Firm's leadership selected those companies because they were perceived to be easy targets willing to pay substantial settlements. *Id.* ¶ 39. False product-identification testimony, in turn, drove settlements—the "outcome" the scheme was designed to produce. *Id.* ¶ 54.

Depo attorneys were trained on the Bounty Program protocols. *Id.* ¶¶ 42-44. The training instructed depo attorneys to show plaintiffs product-identification booklets and have them pretend to "recognize" the bounty-list products; to teach plaintiffs to testify falsely that they had developed product lists themselves when in fact the attorneys provided them; to require plaintiffs to copy product lists by hand to manufacture the appearance of independent recall; and to delay filing

---

and snap cutters which produced minimal dust. J-MM was founded to produce and supply PVC and other plastic pipe and did so since the company was founded in 1983. ACP was supplied from 1983 – 1988, as a transitional product because so many water districts required ACP.

bankruptcy-trust claims until after the tort depositions, so plaintiffs could misleadingly deny having filed such claims when asked under oath. *Id.* ¶¶ 41, 45, 72, 101.

The Bounty Program continued in this form through at least March 2022. *Id.* ¶ 36. And the litigation methodology the program established—the impossible work-history claims, the absence of any ACP-exposure allegation in the underlying complaints, the false product identifications, the trust-claim suppression, and the batch-settlement strategy—persisted. The five most recent sample cases (*Mallam*, filed 10/10/2024; *Pruitt*, 11/7/2024; *Robb*, 1/13/2025; *Moraski*, 3/13/2025; *Ramirez*, 3/18/2025) replicate the pattern, with the same partner signatories—Defendants Sara Salger, Erin Beavers, and Jason Steinmeyer—appearing in the same roles. *Id.* ¶¶ 60-68, 70, 93.

### 2.    <u>The Sample Cases</u>

The Complaint identifies twelve cases that exemplify the scheme, each pleaded with the case caption, court, docket number, filing date, signing attorney, the date and signatory of any verified interrogatory response, and the precise factual basis on which the case lacked merit. *Id.* ¶¶ 58-70, 92-95. The sample cases are not the universe of fraudulent filings; they are merely representative.

In eight of those twelve cases—*Gagnon*, *Podorski*, *White*, *Christman*, *Miller*, *Pruitt*, *Moraski*, and *Ramirez*—the plaintiff's or decedent's work history ended *before 1983* (*id.* ¶ 65-70), so exposure to a J-MM product was a chronological impossibility. And in nearly every sample case, the underlying state-court complaint contained no allegation of exposure to asbestos-cement pipe. *Id.* ¶ 70. Defendants named J-MM as a defendant anyway.

### 3.    Volume and Settlement Pressure

Of approximately 434 lawsuits filed against J-MM since 2018, Defendants have voluntarily dismissed roughly 418—a 96.3% dismissal rate. *Id.* ¶ 4. Defendants do not dispute this number. Defendants' fraudulent campaign relied on filing a high volume of cases to force settlements despite the firm's relatively small size. *Id.* ¶ 47.

Defendants reinvested the settlement proceeds into Bounty Program payments, partner salaries, and litigation marketing designed to bring more cases against the bounty-list companies, including J-MM. *Id.* ¶¶ 111, 133-34, 158.

### 4.    A No-Poach Agreement Protects the Scheme From Disclosure

To prevent the scheme from being exposed, the Firm maintained an anti-competitive "no-poach" agreement with two other plaintiff's asbestos law firms. *Id.* ¶ 56. The agreement was designed to silence former Gori attorneys and depo attorneys who might otherwise migrate to competing firms and disclose what they had observed. *Id.* The whistleblower whose information animates this Complaint surfaced in spite of that agreement. *Id.* ¶ 35.

## LEGAL STANDARD

In resolving a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true, and reasonable inferences run in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Rule 9(b)'s particularity requirement applies to fraud-based RICO predicates. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019). The rule, however, "must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim[.]" *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998). It is also flexible by design: the Seventh Circuit has long instructed that the requisite "who, what, when, where, and how" "may vary on the facts of a

6

given case." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011).

**ARGUMENT**

I.   ***NOERR-PENNINGTON* DOES NOT IMMUNIZE THE GORI FIRM'S CONDUCT**

    A.   **J-MM Need Only Plausibly Allege Sham Litigation, Not Prove It**

*Noerr-Pennington* is an affirmative defense, and the sham exception turns on the defendants' subjective intent in pursuing the underlying litigation. District courts have routinely declined to address the *Noerr-Pennington* doctrine at the motion-to-dismiss stage, particularly where the sham litigation exception may be involved. *See*, *e.g.*, *Int'l Star Registry of Ill., Ltd. v. RGIFTS Ltd.*, 2025 WL 2766304, at *6 (N.D. Ill. Sept. 26, 2025) (declining to resolve the doctrine on the pleadings where the sham exception was implicated); *Navient Solutions, LLC v. Law Offices of Jeffrey Lohman, P.C.*, 2020 WL 1867939, at *4 (E.D. Va. Apr. 14, 2020) (same, collecting cases); *Rackemann v. LISNR, Inc.*, 2018 WL 4574342, at *6 (S.D. Ind. Sept. 24, 2018) (collecting cases).

The relevant question on this Motion is not whether Defendants might be able to prove facts establishing the immunity defense, but whether the Complaint plausibly pleads facts that could take the case out of *Noerr-Pennington*. The Complaint plainly does. Defendants' contrary argument repeatedly demands that J-MM *prove*, on the pleadings, that each underlying state-court case was objectively baseless. That argument gets the standard backwards. At the Rule 12(b)(6) stage, the sole burden is to plead allegations from which a reasonable inference of sham litigation may be drawn. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If J-MM does so, *Noerr-Pennington* is properly tested with a developed record—not on the pleadings, before discovery brings to light the Firm's training materials, internal communications, and bounty-payment records.

The substance of the sham allegations is set out below. The pleading standard is plausibility. By that standard, Defendants' Motion fails.

**B.      The Complaint Plausibly Alleges Objectively Baseless Litigation in Eight Sample Cases**

Litigation is "objectively baseless" when "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993) ("*PRE*"). The Complaint plausibly alleges objective baselessness in eight of the twelve sample cases—*Gagnon*, *Podorski*, *White*, *Christman*, *Miller*, *Pruitt*, *Moraski*, and *Ramirez*—where the plaintiff's work history ended *before J-MM existed* in 1983. Compl. ¶¶ 65–73. Exposure to a J-MM product in those cases was a chronological impossibility. No reasonable litigant could expect to prove what could not have happened.

Defendants *knew* their claims against J-MM were entirely frivolous. They maintain extensive defendant-tracking databases. *Id.* ¶ 100. The Firm's own marketing materials describe Johns-Manville's 1982 bankruptcy as part of their pitch to plaintiffs—meaning the 1983 founding date of J-MM is not just publicly known, it is something the Firm has integrated into its branding. *Id.* ¶ 100. Defendants signed each of these eight complaints against J-MM despite having information proving the falsity of the allegations.

In addition to the eight baseless cases mentioned above, the *Mallam* case provides a particularly sharp example. The *Mallam* complaint alleged exposure to asbestos through *talcum powder*. Compl. ¶ 62. J-MM has never made talcum powder. There is no theory of exposure—primary, secondary, take-home, or otherwise—that could conceivably trace from a talcum-powder allegation to J-M's underground asbestos-cement pipe. The case was objectively baseless against J-MM as a matter of basic product mismatch.

Defendants do not point to any facts—alleged in the complaint or otherwise—about the complaints against J-MM in *Gagnon*, *Podorski*, *White*, *Christman*, *Miller*, *Pruitt*, *Moraski*, *Ramirez,* or *Mallam* that rebuts well-pled allegations of baselessness.[2] It may be true, as Defendants point out, that these plaintiffs "suffered adverse health effects of asbestos-ridden products." But Defendants cannot seriously contend that the mere fact of a plaintiff's illness gives license to file claims with knowingly frivolous theories of exposure.

Rather than pointing to any fact present in these cases that might rebut baselessness, Defendants instead hypothesize about the secondary-exposure doctrine. According to Defendants, any of the eight pre-1983 plaintiffs *might* have been indirectly exposed to asbestos via household-member contact. However, they identify nothing in the record specific to *these* eight plaintiffs that would support a secondary-exposure theory. At any rate, all J-MM must do at this stage is plausibly allege baseless litigation with factual support—exactly as it has done. Hypothesizing conceivable theories of exposure, without any support tied to the actual plaintiffs in the baseless litigation Defendants filed, cannot defeat J-MM's well-pleaded allegations on a motion to dismiss.

The aggregate evidence reinforces the inference. Defendants filed roughly 434 lawsuits against J-MM since 2018 and voluntarily dismissed approximately 418 of them. *Id.* ¶ 4. A 96.3 percent dismissal rate is not the signature of zealous advocacy occasionally meeting bad evidence; it is the signature of a litigation business model that treats objectively baseless filings as bargaining chips. A District Court explained this point perfectly in a recent order denying a *Noerr-*

---

[2] It is true, as Defendants point out, that J-MM moved to dismiss the complaint in *Podorski* on personal-jurisdiction grounds. Mem. 14-15. But Defendants do not cite a single case remotely holding that the sham exception cannot apply if the baseless litigation was defeated on jurisdictional grounds.

9

*Pennington* motion to dismiss: "The dismissal of claims against Uber (seemingly the alleged primary tortfeasor) immediately following discovery requests permits the inference the lawyers did not intend the filings to adjudicate claims on the merits but to leverage the litigation process itself." *Uber Technologies v. Simon & Simon, P.C.*, 2026 WL 1284178, at *10 (E.D. Pa. May 11, 2026). Just as in that case, Defendants' alleged sky-high dismissal rate plausibly supports the inference that they were fraudulently extracting settlements on baseless claims, not legitimately petitioning the courts.

Defendants' rejoinder is that lawsuits terminating in favorable settlements, by definition, cannot be objectively meritless. Mem. 13-14. But with so many outright dismissals, the total number of cases ending in settlement is necessarily low. Pointing to a few favorable settlements will not give Defendants immunity for filing a sea of baseless complaints. But more fundamentally, Defendants' argument gets the Supreme Court's *PRE* standard backwards. *PRE* asks whether a reasonable litigant could realistically expect success on the merits. 508 U.S. at 60. It does not ask whether the litigant could extract a settlement under duress. A scheme designed to use baseless filings as bargaining chips precisely to *avoid* merits adjudication is sham litigation. An individual who expects an objective baseless suit to succeed in coercing a settlement cannot, by definition, be a reasonable litigant. As the *Uber Technologies* court recently explained, "[t]he existence of settlements does not resolve the inquiry" where the plaintiff alleges it "settled because of factors independent of the merits, such as litigation costs or reliance on allegedly fabricated evidence." 2026 WL 1284178, at *10.[3] That is precisely what J-MM has plausibly alleged here.

---

[3] The court in *Uber Technologies* was "not persuaded" by the reasoning in *Ford Motor Company v. Knight Law Group*, 2025 WL 3306280 (C.D. Cal. Nov. 24, 2025), a decision Defendants rely on heavily. *Uber Technologies*, 2026 WL 1284178, at *12. As the *Uber* court explained, the litigation-related fraud in *Ford* did not infect the underlying merits of the claims. *Id.* at *13–14. The allegation in *Ford* was that, after filing apparently meritorious product-defect claims, the law

10

C.      **The Complaint Plausibly Alleges Material Misrepresentations That Altered
the Outcome of the Underlying Proceedings**

The sham exception has a second, independent branch: misrepresentations to the court that "deprive the litigation of its legitimacy" can defeat *Noerr-Pennington* immunity even where a single suit would otherwise colorably proceed. *PRE*, 508 U.S. at 61 n.6; *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 (7th Cir. 2011) ("[T]here is little doubt that fraudulent misrepresentations may render purported petitioning activity a sham not protected from antitrust liability"). In the Seventh Circuit, "a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Mercatus*, 641 F.3d at 843; *see also Uber Technologies*, 2026 WL 1284178, *12 (denying motion to dismiss in part because plaintiff's "allegations suffice to place in dispute whether the alleged misrepresentations 'infect the core' of the underlying claims at this stage").

Defendants read *Mercatus* as if it requires a misrepresentation to have changed a judicial ruling. The Seventh Circuit has said no such thing. The Court of Appeals tied materiality to outcome, not to ruling—and an outcome includes any disposition that resolves the litigation. The most usual outcome in civil litigation is *settlement*. Where a misrepresentation actually altered the outcome of a case—settlement or otherwise—*Mercatus*'s materiality test is satisfied. And the Complaint alleges precisely that. Instructed, fraudulent product-identification testimony drove the settlements that the Bounty Program was designed to produce. Compl. ¶ 53. The deposition

---

firm had submitted fraudulent attorneys' fee statements. *Ford Motor Company*, 2025 WL 3306280, at *11. *Uber* distinguished *Ford* on those grounds, finding *Ford* inapplicable in a case where the claims themselves were entirely baseless. *Uber Technologies*, 2026 WL 1284178, at *13–14. *Ford* is distinguishable for the same reason here: Defendants' fraud "went to the factual predicate of the underlying … claims." *Uber Technologies*, 2026 WL 1284178, at *14.

11

attorneys' bonus payments were, by design, tied to "total settlement proceeds." *Id.* ¶ 36. Accordingly, materiality is alleged on the face of the Complaint.

Indeed, the Complaint pleads specific affirmative misrepresentations of fact in sworn pleadings and verified discovery responses. Two examples illustrate the pattern. First, in the *Mallam* complaint, Defendants alleged that the plaintiff was exposed to asbestos from J-MM's products. Compl. ¶ 61. That allegation was false, however, because the plaintiff was a teacher, among other things, and the alleged exposure pathway was talcum powder, which J-MM has never made. *Id.* ¶¶ 60-63. Second, in the *Ramirez* complaint, Defendants alleged the plaintiff was exposed to asbestos from J-MM's products. *Id.* ¶ 66. Again, that allegation was false, because Ramirez's claimed exposure closed before 1983, when J-MM did not yet exist. *Id.* ¶¶ 21, 67-68. In short, each of these two complaints contained an affirmative, verifiable factual statement—that the plaintiff was exposed to a J-MM product—that Defendants knew, on the basis of the plaintiff's own work and claimed exposure history, and the underlying product mismatch, was false at the time it was filed and signed.

Beyond the pleadings, the Complaint alleges that Defendants secured deposition testimony through teaching and product-booklet manipulation that resulted in plaintiffs *affirmatively swearing* falsely that they had encountered J-MM products. Compl. ¶¶ 36, 72, 92(i), 151. Each such statement is an affirmative misrepresentation of fact under oath, and each materially altered the outcome of the underlying case by driving settlement.

That is enough. The materiality standard that *Mercatus* recognized is met by allegations that fraudulent product identifications drove the outcomes—*i.e.*, settlement on inflated terms. The doctrinal standard for the sham exception's second branch is satisfied.

12

## II.    COUNTS ONE AND TWO STATE VALID CLAIMS UNDER § 1962(C)

Defendants devote much of their Memorandum to attacking Counts One and Two. The attack rests on four propositions: (i) the "person" and "enterprise" are not distinct, (ii) the alleged enterprise lacks a common purpose, (iii) the alleged enterprise lacks an organizational structure, and (iv) the predicate acts of fraud are not pleaded with the particularity Rule 9(b) requires. Each of these arguments fails.

### A.    The "Person/Enterprise" Distinctness Argument Misreads the Complaint

Defendants assert that the Complaint names Gori Law as both the RICO person and the RICO enterprise, and it is therefore barred by *Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001). Mem. 18. The Complaint says no such thing. Count One names *the individual partners*— Gori-Gregory and Salger—as the "persons," with the Gori Law Firm as the legal-entity enterprise. Compl. ¶¶ 108–09. Count Two names all of the individual defendants as the "persons," with the Bounty System Enterprise as a separate association-in-fact enterprise. *Id.* ¶¶ 119, 120–122. The Firm is named as a "person" only in Count Three, the § 1962(a) investment count.

That structural pleading tracks *Cedric Kushner* precisely. The Supreme Court held that a corporate entity may serve as the RICO enterprise while its officer or sole shareholder serves as the RICO "person," because the two are distinct entities for RICO purposes. 533 U.S. at 163. The Court expressly rejected the notion that an officer's status as the company's owner or principal collapses distinctness. *Id.* at 164-66.

Defendants invoke the dismissal in *J-M Mfg. v. Simmons Hanly Conroy*, 2025 WL 843854 (N.D. Ill. Mar. 18, 2025). But *Simmons Hanly* resulted in dismissal because the complaint there named both the firm itself *and* the individual lawyers as RICO "persons" against the firm as the enterprise—the precise structural redundancy *Cedric Kushner* warns against and that has been avoided in the case at bar. 2025 WL 843854 at *6. Likewise, the other cases Defendants cite also

13

addressed plaintiffs who had named the corporation as both a "person" and part of the enterprise. *See Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120-21 (2d Cir. 2013); *Ratfield v. U.S. Drug Testing Laboratories, Inc.*, 2024 WL 640955, at *3 (N.D. Ill. Feb. 15, 2024). None of these cases held that an officer-as-person and corporation-as-enterprise structure violates the distinctness requirement. That requirement is satisfied here.

> **B.      The Complaint Pleads a Common Purpose for Both the Legal-Entity Enterprise (Count One) and the Association-in-Fact Enterprise (Count Two)**

Defendants offer two contradictory propositions about RICO "common purpose." First, they argue that a RICO enterprise cannot have a lawful common purpose and so a law firm engaged in legitimate practice cannot be an enterprise. Mem. 22. But next they argue that the enterprise must have a purpose other than the racketeering activity itself. *Id.* However, the Seventh Circuit's actual rule, applied separately to legal-entity enterprises (Count One) and association-in-fact enterprises (Count Two), defeats both contentions.

> **1.      Count One (Legal-Entity Enterprise): No Additional "Purpose" Showing Is Required**

For a corporate entity that itself serves as the enterprise (as opposed to an association-in-fact enterprise), no Seventh Circuit case imposes an additional "purpose" element. Other courts have affirmatively recognized that the bare corporate form suffices to make out an "enterprise." *See United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981) ("Presumably if [the existence of a 'legal entity' RICO enterprise were] contested at all it would involve proof simply of the 'legal' existence of the corporation . . . Neither the actual nor ostensible purpose of such an enterprise would seem directly relevant[.]"). The cases cited by Defendants do not change this understanding, because they all involved association-in-fact enterprises. *E.g.*, *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000); *Baker*, 357 F.3d at 691;

14

*Cardenas v. RIA Tele., Inc.*, 2001 WL 536043, *3 (N.D. Ill. May 18, 2001); *Luna v. 4C Kinzie Investor LLC*, 2019 WL 1239770, *1 (N.D. Ill. March 18, 2019); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 807-08 (N.D. Ill. 2014).

In Count One, the Complaint alleges that the Gori Law Firm is the legal-entity enterprise. That is enough.

### 2. Count Two (Association-in-Fact): The Bounty System's Structure and Goals Are Separate from the Predicate Acts

For an association-in-fact enterprise, the Seventh Circuit requires allegations of "an organization with structure and goals separate from the predicate acts themselves." *Stachon*, 229 F.3d at 675 (cleaned up). The Complaint pleads exactly that.

The Bounty System Enterprise comprises the Firm's leadership, the partner-trainers (Salger, Beavers, Steinmeyer, and Layloff), and the depo attorneys, bound together by the bounty-payment incentive structure. Compl. ¶¶ 84–86, 119, 121–122. Its goal is the systematic generation of fraudulent product identifications across many cases, against many bounty-list companies, over many years, in order to extract settlement revenue. *Id.* ¶ 122. Its structure is the bounty-payment mechanism itself: a tiered, formal system through which depo attorneys participate in the Firm's settlement income on a percentage basis. *Id.* ¶ 85.

That structure—and its associated goal of generating settlement revenue through fraud— exists independently of any individual predicate act. It preexists the predicate acts, persisted across many predicate acts, and was the *means* by which the predicate acts were generated. The Supreme Court has recognized that an enterprise whose members use criminal means to pursue an economic objective has a legally sufficient common purpose. *Boyle v. United States*, 556 U.S. 938, 946–47 (2009); *United States v. Turkette*, 452 U.S. 576, 583 (1981).

15

C.    **The Bounty System Has a Distinct Organizational Structure (Count Two)**

Defendants argue that the Bounty System Enterprise fails because it lacks an ongoing organization. As an initial point, this attack applies only to Count Two and not to Count One. And as to the Bounty System associated-in-fact enterprise, the Complaint alleges a tiered structure with named participants in defined roles: Gori-Gregory and Salger as leaders; Beavers, Steinmeyer, and Layloff as middle management; and depo attorneys as the field operatives. Compl. ¶ 85. The structure has functioned continuously since at least 2018, operating across scores of underlying state-court cases. *Id.* ¶ 83, 121. That is a textbook associated-in-fact enterprise of the variety the Supreme Court recognized in *United States v. Boyle*: persons "associated together for a common purpose of engaging in a course of conduct," with "a structure," "relationships among those associated with the enterprise," and "longevity sufficient to permit these associates to pursue the enterprise's purpose." 556 U.S. at 946.

D.    **Rule 9(b) Is Satisfied as to the Pattern of Racketeering Activity**

Defendants further challenge Counts One and Two by contending that the Complaint does not identify the predicate mail- and wire-fraud acts with the particularity Rule 9(b) requires. The challenge fails.

1.    **The Governing Standard Is Flexible and Relaxed Where Information Is in Defendants' Exclusive Control**

The Seventh Circuit's Rule 9(b) standard is not the rigid "every detail of every act" rule Defendants' brief presupposes. Plaintiffs ordinarily must describe "the who, what, when, where, and how of the fraud"—the first paragraph of any newspaper story. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011). But the Court of Appeals has emphasized that "courts and litigants often erroneously take an overly rigid view of the formulation[.]" *Id.* The correct view is that "the requisite information—

16

what gets included in that first paragraph—may vary on the facts of a given case." *Id.* at 442. Where the missing facts are inaccessible to the plaintiff, the rule is relaxed by design. *Id.* For example, pleading fraud by information and belief "is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* (cleaned up); *see also Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim[.]").

The grounds for J-MM's suspicions are extensively pleaded. A whistleblower—a former Gori attorney—has come forward with critical details about the Bounty Program. Compl. ¶ 41. The Complaint describes the bounty mechanism ("up to 2% of total settlement proceeds"), the duration of the program (no later than 2018 through at least March 2022), the target list, and the training protocols. *Id.* ¶¶ 36, 38, 41-52. The names of individual depo attorneys, the specific dollar figures of individual bonus payments, and the contents of the Firm's internal training records lie in Defendants' exclusive control. Defendants attempt to hold the whistleblower's incomplete personal knowledge against J-MM, but the rule cuts the other way: the brave individual who has come forward despite the no-poach agreement designed to silence him cannot single-handedly supply every operational detail, and Rule 9(b) does not require him to.

### 2. Two Specific Affirmative Misrepresentations: The *Mallam* and *Ramirez* Complaints

Even setting aside the relaxed standard, the Complaint pleads two specific, affirmative false statements with particularity. First, the Complaint details Defendants' fraud in connection with the *Mallam* case. The Complaint states that on or about October 10, 2024, the Gori Firm electronically filed the complaint in *Mallam*, in the Circuit Court of Madison County, Illinois, naming 30 defendants, including J-MM. Compl. ¶ 60. Sara Salger, Erin Beavers,

17

Jason Steinmeyer, and Ivan Cason were listed among the attorneys of record and Salger signed the complaint. *Id.* Defendants alleged that Mallam developed mesothelioma as a result of his exposure to asbestos contained in various products made, sold, or distributed by the named defendants, including J-MM. *Id.* ¶ 61. This accusation against J-MM was false and objectively baseless because, as the Gori attorneys knew, there was no allegation or evidence that decedent was ever exposed to ACP, and his occupations involved no potential exposure to underground pipe. *Id.* In fact, Defendants simultaneously alleged that plaintiff "was exposed to asbestos containing products through the use of talcum powder." *Id.* ¶ 62. The lawsuit was therefore brought with subjective intent to gain leverage in batch settlement discussions rather than to obtain relief on the merits. *Id.* ¶ 61. The frivolous lawsuit nevertheless forced J-MM to spend significant sums of money to defend against the bogus allegations. *Id.* ¶ 64.

Second, the Complaint details Defendants' fraud in connection with the *Ramirez* case. The Complaint states that on or about March 18, 2025, the Gori Firm electronically filed the complaint in *Ramirez*, in the Circuit Court of Madison County, Illinois, naming approximately 49 defendants, including J-MM. *Id.* ¶ 65. Sara Salger, Erin Beavers, Jason Steinmeyer, and Ivan Cason were listed among the attorneys of record, and Salger signed the complaint. *Id.* Defendants alleged that Ramirez developed mesothelioma as a result of exposure to asbestos contained in various products made, sold, or distributed by the named defendants, including J-MM. *Id.* ¶ 66. This accusation against J-MM was false and objectively baseless because, as the Gori attorneys knew, there was no allegation or evidence that decedent was ever exposed to ACP, and his occupations involved no potential exposure to underground pipe. *Id.* For example, on or about April 24, 2025, Sara Salger and Erin Beavers served responses to the defendants' standard asbestos interrogatories, signed by Beavers, which made clear that Ramirez's work history lacked any role involving

18

potential occupational exposure to underground pipe. *Id.* ¶ 68. The lawsuit was therefore brought with the subjective intent to gain leverage in batch settlement discussions rather than to obtain relief on the merits. *Id.* ¶ 66.

For each of these predicates, the Complaint identifies the *who* (the signing partner and the partners listed), the *what* (an affirmative false statement of exposure to a J-MM product), the *when* (a specific date of electronic filing), the *where* (a specific court), and the *how* (electronic transmission across state lines). That is the first paragraph of the newspaper story. *Pirelli*, 631 F.3d at 442. It is also a clear predicate act of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The Complaint also identifies ten additional sample-case predicates with similar information provided. Compl. ¶ 70, 100.

### 3. Defendants' Other Rule 9(b) Arguments Misread the Complaint

Defendants argue that the alleged fraud is based on omissions from the underlying complaints, because at times the Complaint notes that "there was no allegation or evidence that decedent was ever exposed to ACP…" Mem. 30. However, the context makes clear the Complaint alleges an affirmative misrepresentation, not just concealment. As alleged by J-MM, the *Mallam* complaint claimed that "Mallam developed mesothelioma as a result of his exposure to asbestos contained in various products made, sold, or distributed by the named defendants, including J-MM." Compl. ¶ 61. Contrary to Defendants' contention, this was a "materially false statement or misrepresentation in [one] of the sample cases [and a statement] made in furtherance of the fraudulent scheme." Mem. 29.

Defendants also contest RICO injury, contending that *Evans v. City of Chicago*, 434 F.3d 916, 931 (7th Cir. 2006), prohibits claiming defense cost as a § 1964(c) injury. Defendants misread *Evans*, which applied 18 U.S.C. 1964(c)'s requirement that the racketeering injure the plaintiff's "business or property." The plaintiff in that case, an individual, tried to convert a malicious

19

prosecution claim into a RICO action. *Evans*, 434 F.3d at 931. To establish injury, he pointed to the costs he incurred in defending against the criminal charges. The Seventh Circuit held that because "personal injuries" are insufficient under the statute, the same reasoning barred "pecuniary losses stemming therefrom" like loss of employment income and defense costs. 434 F.3d at 930-31. By its terms, the case has no application here, where a corporate plaintiff squarely claims business—not personal—injuries. *See also Living Designs, Inc. v. E.L. Dupont de Nemours and Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (holding that a business's undervalued settlement tainted by fraud was a cognizable RICO injury).

### E.    Wire Fraud and Mail Fraud Committed in Litigation Are Predicate Acts

Defendants' last effort is to argue that mail- and wire-fraud predicates committed in the course of litigation can never sustain a civil RICO claim.

This argument relies almost entirely on the Second Circuit's decision in *Kim v. Kimm*, 884 F.3d 98 (2d Cir. 2018). *Kim*, which crafted a rule based not on statutory text but instead on "policy arguments," *id.* at 104, does not bind this Court. Section 1962(c) reaches "any person employed by or associated with any enterprise" who conducts the enterprise's affairs through "a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1961(1) defines "racketeering activity" by reference to specific federal crimes—mail fraud, wire fraud, and others—without regard to whether those crimes happen to be committed in the course of litigation. Nothing in the statute exempts criminal conduct because it occurred in a courtroom. The Ninth and Tenth Circuits have correctly recognized as much: fraud committed in the context of litigation may constitute a RICO predicate. *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258–59 (10th Cir. 2003). The Seventh Circuit has not adopted *Kim*'s rule, and this Court should decline to be the first.

20

In any event, even if the *Kim* exception were valid, the schematic, pervasive fraud alleged in the Complaint does not fall within it. The Second Circuit confined *Kim*'s holding to a case of "a single frivolous, fraudulent, or baseless lawsuit," and declined to "reach the issue of whether all RICO actions based on litigation activity are categorically meritless." 884 F.3d at 104. The Second Circuit also acknowledged a "corruption" exception. *Id.* (quoting *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524–25 (5th Cir. 2016)). Indeed, the *Uber Technologies* court held that *Kim* did not bar that case because it involved allegations of "a coordinated, multi-actor scheme spanning dozens of lawsuits over several years." *Uber Technologies*, 2026 WL 1284178, *21. As that court explained, "existing sanctions regimes governing ordinary litigation misconduct" do not "provide a meaningful remedy" for a "systemic mass scheme" of fraud. *Id.* Because the Complaint in this case plausibly alleges a multi-year, multi-case scheme of mail fraud, wire fraud, and subornation of perjury, *Kim*—even by its own terms—poses no bar.

F.     **Each Individual Defendant Is Tied to Dated, Document-Anchored Acts of Operation and Management**

Section 1962(c) requires that each individual defendant participate in the "operation or management" of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Under Seventh Circuit precedent, "lower-rung participants in the enterprise who are under the direction of upper management" satisfy the *Reves* standard. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 978 (7th Cir. 1995) (cleaned up). The Complaint pleads with specificity each individual's role in participating in the operation or management of the enterprise:

Beth Gori-Gregory is the Principal Partner and Owner at the Gori Firm. Compl. ¶ 26. Gori-Gregory has ultimate authority over firm policies, including the implementation of the Bounty Program, the approval of the bounty list of target defendants, and the strategic decisions that enabled the fraudulent scheme. *Id.* ¶ 23. Gori-Gregory devised the Bounty Program. *Id.* ¶ 39.

21

Sara Salger is Managing Partner at the Gori Firm. Compl. ¶ 24. Salger co-devised the Bounty Program. *Id.* ¶ 39. Salger personally signed numerous fraudulent and baseless complaints, including those in *Mallam* and *Ramirez*. *Id.* ¶ 92. Salger hired, trained, and fired depo attorneys. *Id.* ¶ 80. She set firm policy on case handling; directed firm spending on advertising; negotiated and liaised with referral firms; made decisions about which cases to file, including the filing of objectively baseless lawsuits; and determined settlement or dismissal strategy across multiple cases. *Id.*

Erin Beavers is a partner at the Gori Firm who supervised the implementation of the bounty system. *Id.* ¶ 25. Beavers conducted periodic training sessions for depo attorneys via videoconference (using interstate wires), including training on identifying "high-value" versus "low-value" defendants and the types of testimony required to maximize settlement values against bounty defendants. *Id.* ¶ 93(g). She was the attorney of record on the five most recent sample-case complaints—*Mallam*, *Pruitt*, *Robb*, *Moraski*, and *Ramirez*.

Jason Steinmeyer is a partner at the Gori Firm who conducted training sessions for depo attorneys and participated in the implementation of the bounty system. *Id.* ¶ 26. In particular, drawing on his experience as former Director of the White-Collar Crime and Fraud Unit in the St. Louis Circuit Attorney's Office, he conducted training sessions for depo attorneys on techniques for "maximizing case values," including methods for coaching plaintiffs to identify widely-known corporate defendants that were easier to "recognize" during depositions. *Id.* ¶ 94(e). Like Beavers, he was attorney of record on the five most recent sample-case complaints—*Mallam*, *Pruitt*, *Robb*, *Moraski*, and *Ramirez*.

Christopher Layloff is a partner at the Gori Firm who implemented the bounty system, negotiating and executing batch settlements that bundled objectively baseless "dismissal" cases

22

with cases containing coached and fabricated testimony to extract inflated settlement values. *Id.* ¶ 27, 39. Layloff thereby extracted settlement values that exceeded what J-MM would have paid had it known the dismissed cases were deliberate shams. *Id.* ¶ 95(a). Layloff provided training sessions via videoconference to depo attorneys on techniques for using product identification booklets to coach witnesses. *Id.* ¶ 95(c). This training included instructions on how to guide plaintiffs through the booklets to "recognize" products they never actually encountered, thereby manufacturing false identifications against bounty defendants including J-MM. *Id.*

Defendants characterize all of this as "the routine practice of law." Mem. 7-9, 37-45. That characterization works only by ignoring what the Complaint pleads: that the individual defendants devised and oversaw the Bounty Program, which they implemented through subordinate depo attorneys.

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998), provides Defendants no help. In that case, the Seventh Circuit affirmed dismissal against defendants whose only alleged conduct was (1) licensing the use of a name for promotional purposes, (2) producing promotional materials, and (3) taking orders as a "business partner." 156 F.3d at 727–28. As such, the Seventh Circuit was right to note that "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c); instead, the individual must have participated in the operation and management of the enterprise itself." *Id.* at 728. J-MM has not alleged that the individual defendants were "simply performing services for an enterprise." The Complaint pleads, with specificity, that each of the individual defendants managed and operated the enterprise by developing the "bounty system," training others on the "bounty system," and/or implementing the "bounty system" in the filed cases. That is operation and management within the meaning of *Reves*.

23

III.    **COUNT THREE STATES A VALID CLAIM UNDER § 1962(A)**

To state a § 1962(a) claim, J-MM must plead that a defendant: (1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise. *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 398–99 (7th Cir. 2009). Section II above demonstrates that J-MM has pleaded a pattern of racketeering activity yielding income to the Firm. The Complaint also alleges that the Firm reinvested that income in the Bounty Program and in litigation marketing to expand the scheme. Compl. ¶ 133. The first two elements are satisfied.

As for the third element, Defendants argue that the Complaint fails to allege an injury caused by the *use or investment* of the racketeering income, distinct from the injury caused by the predicate acts themselves. Mem. 48. They are wrong on the law and wrong on the facts.

A.    **The Seventh Circuit Has Not Required Investment-Use Injury, and the Statutory Text Supports J-MM**

As an initial matter, Defendants are wrong to suggest that precedent requires a distinct injury from the investment of funds to sustain a § 1962(a) claim. To the contrary, the Seventh Circuit has expressly declined to adopt such a requirement. In *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771 (7th Cir. 1994), the Court surveyed a circuit split on the question and *expressly declined* to take a position:

> Although our circuit has not addressed the issue to date, the majority of circuits hold that the use or investment of the racketeering income must proximately cause the plaintiff's injury; injury caused by the predicate racketeering acts is inadequate. . . . However, because we conclude that Vicom has failed to demonstrate the existence of a "pattern" of racketeering activity, we need not state definitively our view on the majority's requirement that an allegation of investment-use is necessary to assert standing under § 1962(a)[.]

24

20 F.3d at 778 n.6. Three decades later, the Court of Appeals has not decided the issue and the question remains open.

Where a question of statutory interpretation is open, this Court should resolve it by reference to the statutory text. Section 1962(a) makes it unlawful for any person who has received income derived from a pattern of racketeering activity "to use or invest, directly or indirectly, any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any enterprise[.]" 18 U.S.C. § 1962(a). The statute is silent as to whether the plaintiff's injury must flow from the use-or-investment step (as opposed to the underlying racketeering). Section 1964(c), the civil-action provision, provides standing to "[a]ny person injured in his business or property by reason of a violation of section 1962[.]" It does not condition standing on injury flowing from any particular sub-element of the substantive violation. Reading § 1962(a) to require an injury distinct from that caused by the racketeering pattern adds a textual restriction Congress did not draft. The Fourth Circuit said as much, holding that no investment-use injury need be alleged. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837-38 (4th Cir. 1990).

Because no precedent requires a distinct investment-use injury, and the statutory text provides no basis for such a condition, Count Three states a claim on the allegations as pleaded.

B.  **The Allegation of Targeted Reinvestment Against the Same Plaintiff Satisfies Any Heightened Standard**

Even if the Court were to adopt the majority circuits' rule, the policy concern that animates that rule does not apply here. The Third Circuit in *Brittingham v. Mobil Corp.*, 943 F.2d 297, 305 (3d Cir. 1991) *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258 (3d Cir. 1995), worried that allowing generic corporate reinvestment of profits to satisfy § 1962(a) would "almost completely eviscerate[]" the use-or-investment-injury

25

requirement, because "[o]ver the long term, corporations generally reinvest their profits, regardless of source." That concern is sensible, but it does not reach what the Complaint here alleges.

The Complaint alleges that the Gori Firm used racketeering-derived income to make Bounty Program payments and fund litigation-marketing expenditures specifically targeted at generating *more* fraudulent cases against J-MM. Compl. ¶ 134. Those payments and expenditures are not generic corporate reinvestment; they are deliberate, recurring, directed deployments of racketeering income, calibrated to expand the scheme against the same victim that bore the predicate-act injury. *Brittingham*'s rationale does not apply because *Brittingham*'s factual premise—the generic reinvestment any corporation might make—is absent.

Further, even crediting the strictest version of the out-of-circuit rule, the Complaint alleges injury flowing from the investment step itself. The Bounty Program payments funded by racketeering income are themselves the operational mechanism by which additional baseless cases against J-MM are generated. The injury J-MM suffers from each *new* baseless case—defense costs, inflated settlements, and reputational harm—is not merely the injury from the prior predicate acts. It is a fresh injury proximately caused by the *use* of those prior racketeering proceeds to fund the next round of fraud. Even if *Brittingham* were binding precedent, its concern at reaching activity that is "indistinguishable from generic reinvestment" would not bar J-MM's allegations on this score.

## IV.    COUNTS FOUR AND FIVE STATE VALID CONSPIRACY CLAIMS UNDER § 1962(D)

Counts Four and Five plead RICO conspiracy under § 1962(d). A RICO conspiracy claim does not require that the conspiracy succeed in producing a completed substantive RICO violation; it requires only an agreement to violate one of sections 1962(a) through (c). *Salinas v.*

26

*United States*, 522 U.S. 52, 65 (1997). The Seventh Circuit has applied *Salinas* in civil RICO conspiracy cases. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).[4]

The Complaint alleges an agreement among the individual Defendants—Gori-Gregory, Salger, Beavers, Steinmeyer, and Layloff—to operate the Bounty Program, to suborn product-identification perjury, to conceal trust-claim evidence, and to use the racketeering proceeds to expand the scheme. Overt acts in furtherance of the conspiracy are alleged throughout the Complaint. Collectively, that is enough under *Salinas*. The conspiracy counts therefore survive on their own footing, regardless of the disposition of the substantive § 1962(c) and § 1962(a) counts. Even if the Court were to find any element of those substantive counts inadequately pleaded, the agreement to violate them—coupled with overt acts in furtherance—remains actionable under § 1962(d).

## V.    THE STATE-LAW COUNTS SURVIVE

### A.    The Common-Law Fraud Count Survives

Common-law fraud under Illinois law requires a false statement of material fact, knowledge of falsity, intent to induce reliance, actual reliance, and injury. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).[5] The Complaint pleads each element. Compl. ¶ 149-154. Section II.D above addresses the false-statement, knowledge, intent, and injury elements.

---

[4] *White v. Hill*, 2023 WL 4491469, *3 (S.D. Ill. 2023), is not to the contrary. In that case, the plaintiff—a *pro se* inmate raising scattershot claims—apparently did not even allege an *agreement* to commit a plausible RICO violation. Moreover, the RICO claims in that case failed on a more fundamental ground: failure to allege a non-personal injury under *Evans v. City of Chicago*, 434 F.3d 916, 924-25 (7th Cir. 2006). *See White*, 2023 WL 4491469, *3.

[5] Defendants have not raised any immunity to the state-law claims. Accordingly, any such defenses have been waived. *See, e.g.*, *Peterson v. Village of Downers Grove*, 103 F. Supp. 3d 918, 925 (N.D. Ill. 2015).

27

Defendants raise a new argument only as to reliance, citing *Tocco v. Richman Greer Pro. Ass'n*, 553 F. App'x 473, 475–76 (6th Cir. 2013), in support. In that unpublished case, the Sixth Circuit applied Michigan law. *Id.* Defendants cite no Illinois case adopting *Tocco*'s reasoning. At any rate, that case addressed reliance on out-of-court adversary positioning. *See id.* It did not address reliance on the *truthfulness of evidence* and *sworn testimony*. Those are different categories, and the difference matters. Defendants signed verified pleadings and discovery responses about their clients' exposure histories. They had superior knowledge of their clients' actual work histories, of the false deposition testimony they themselves had elicited, and of the trust claims they had instructed clients to suppress. J-MM was justified in relying on those representations. Defendants exploited that reliance by manufacturing false product identifications, suborning perjury, and concealing trust-claim records. The reliance element is well pleaded.

### B.    The Unjust-Enrichment and Civil-Conspiracy Counts Rise with the Underlying Tort and RICO Counts

Defendants' only argument against the unjust-enrichment and civil-conspiracy counts is derivative: those counts must fall, they say, because the underlying RICO and fraud claims fail. Mem. 49-50. The underlying claims do not fail, for the reasons previously stated. The derivative counts therefore survive as well.

### CONCLUSION

The Gori Law Firm built a litigation business model in which deposition attorneys earned bonuses of up to two percent of total settlement proceeds for coaching clients to commit perjury, 96.3% of the cases filed against J-MM were voluntarily dismissed, and a no-poach agreement with two competing firms was used to keep whistleblowers from disclosing the practice. Defendants' Motion asks this Court to hold that lawyers, by virtue of their membership in the bar, have RICO

28

immunity for professional fraud. Nothing in Defendants' motion merits such a drastic ruling. Defendants cannot claim immunity as a matter of law. The Motion should be denied.

To the extent the Court concludes that any aspect of the Complaint does not suffice, J-MM respectfully requests leave to amend under Rule 15(a)(2) and *Foman v. Davis*, 371 U.S. 178, 182 (1962). Lastly, J-MM reserves the right to surreply if Defendants' reply brief introduces authorities not raised in their Memorandum.


Dated: May 21, 2026                    Respectfully submitted,

                                       */s/ Ashwin J. Ram*
                                       Ashwin J. Ram (ARDC No. 6286478)
                                       BUCHALTER LLP
                                       180 North LaSalle Street, Suite 2300
                                       Chicago, IL 60601-2808
                                       Telephone: (312) 980-5760
                                       aram@buchalter.com

                                       Andrew Erskine (ARDC No. 6305806)
                                       BUCHALTER LLP
                                       180 North LaSalle Street, Suite 2300
                                       Chicago, IL 60601-2808
                                       Telephone: (312) 980-5773
                                       aerskine@buchalter.com

                                       Frank Fletcher (*Pro Hac Vice* Pending)
                                       General Counsel
                                       J-M Manufacturing Company, Inc.
                                       d/b/a JM Eagle
                                       5200 West Century Boulevard
                                       Los Angeles, CA 90045
                                       FrankFletcher@jmeagle.com

29